**Anthony BERTOLOTTI,
Petitioner–Appellant,**

v.

**Richard DUGGER, Secretary, Florida
Department of Corrections,
Respondent–Appellee.**

No. 89–3104.

United States Court of Appeals,
Eleventh Circuit.

Aug. 31, 1989.

Clark, Circuit Judge, filed opinion concurring in part and dissenting in part.

1504

Martin J. McClain, Billy H. Nolas, Capital Collateral Rep., Tallahassee, Fla., for petitioner-appellant.

Richard B. Martell, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before KRAVITCH, CLARK and EDMONDSON, Circuit Judges.

KRAVITCH, Circuit Judge:

Petitioner Anthony Bertolotti, a Florida prisoner under sentence of death, appeals the district court's denial of his petition for the writ of habeas corpus. Concluding that Bertolotti's claims lack merit, we affirm the judgment of the district court.

## I. PROCEDURAL HISTORY

Bertolotti was convicted of first-degree murder for the September 1983 slaying of Carol Miller Ward in Orlando, Florida. The jury returned a general verdict of guilty upon a charge of felony murder and premeditated murder, both of which are death-eligible crimes under Florida law, Fla.Stat. Ann. § 782.04(1)(a); by a vote of nine to three, the jury recommended the death penalty, which the judge imposed on April 12, 1984. The Florida Supreme Court affirmed Bertolotti's conviction and sentence on direct appeal, *Bertolotti v. State*, 476 So.2d 130 (Fla.1985), and Bertolotti voluntarily dismissed a subsequent petition for certiorari filed in the United States Supreme Court. After the Governor of Florida signed a warrant for Bertolotti's execution, Bertolotti filed in the Florida courts two collateral attacks on his conviction. The Florida courts held an evidentiary hearing and granted a temporary stay of execution, effectively nullifying the first execution warrant, but ultimately denied Bertolotti relief. *See Bertolotti v. Dugger*, 514 So.2d 1095 (Fla.1987) (denying state writ of habeas corpus) *and Bertolotti v. State*, 534 So.2d 386 (Fla.1988) (denying Fla.R.Crim.P. 3.850 motion for post-conviction relief).

On January 31, 1989, the Governor of Florida signed a second warrant for Bertolotti's execution.[1] On February 14, 1989,

---

1. The warrant period commenced at noon on February 15, 1989, and was to expire at noon on

Bertolotti filed in federal district court a motion for stay of execution and a petition for the writ of habeas corpus. The petition, Bertolotti's first in federal court, presented eleven grounds for relief:

1. Trial counsel provided Bertolotti with ineffective assistance of counsel when counsel failed to adequately investigate, develop and present defenses at the guilt and penalty phases of Bertolotti's capital trial.

2. The trial court erred by denying Bertolotti's motions for a mistrial based on the prosecutor's improper closing argument at the sentencing phase of the trial.

3. The trial court's denial of Bertolotti's requested penalty phase instruction informing the jury of its ability to exercise mercy deprived Bertolotti of a reliable and individualized capital-sentencing determination.

4. The trial court in its instructions at sentencing unconstitutionally shifted the burden of proof to Bertolotti.

5. The Florida courts have given an impermissibly broad construction to the term "especially heinous, atrocious or cruel" as that term is used in a statutory aggravating circumstance which was found to justify Bertolotti's death sentence.

6. Bertolotti's death sentence is predicated upon the finding of an automatic, non-discretionary-channeling statutory aggravating circumstance.

7. Bertolotti's right to a reliable capital-sentencing proceeding was violated when the state urged that he be sentenced to death on the basis of impermissible "victim impact" evidence.

8. Comments of the judge and the prosecutor throughout the trial impermissibly diminished the jury's sense of responsibility for the awesomeness of its sentencing task.

9. Bertolotti's conviction is void because it may have been based on a constitutionally impermissible ground, and there may not have been juror unanimity.

10. A state witness introduced impermissible evidence of Bertolotti's propensity to crime.

11. The trial judge unconstitutionally failed to grant Bertolotti's motion for a change of venue, and impermissibly limited Bertolotti's ability to voir dire the jury venire.

The district court heard oral argument the morning of February 15, 1989, but declined to hold an additional evidentiary hearing on Bertolotti's claims. Later that afternoon, the district judge denied Bertolotti relief, and refused to issue a certificate of probable cause to appeal; the district court did however enter a twenty-four hour stay of execution to allow Bertolotti time to appeal to this court.[2]

## II. MERITS OF THE APPEAL

Bertolotti reasserts the eleven grounds he alleged in the district court.[3] We will

---

February 22, 1989. The warden scheduled Bertolotti's execution for seven o'clock a.m. on February 16, 1989. Bertolotti, through his counsel the Office of the Capital Collateral Representative, immediately lodged in federal district court and in this court substantial portions of the voluminous state-court record. On February 9, 1989, the district court received an additional volume containing all documents relating to Bertolotti's appeals to the Supreme Court of Florida.

**2.** Bertolotti immediately filed in this court motions for a certificate of probable cause to appeal and for an additional stay, and also filed an appeal of the district court's decision denying the writ of habeas corpus. We granted the motion for stay on February 15, 1989, in order to allow oral argument on the district court's denial of both the certificate of probable cause

and the writ of habeas corpus. *See* 11th Cir.R. 22–3(a)(7). Following oral argument on February 18, 1989, we granted Bertolotti's certificate of probable cause, but by a divided panel affirmed the denial of relief. Bertolotti immediately filed motions for a stay of execution, for rehearing by the panel, and for rehearing in banc. Pending resolution of these motions, Bertolotti's execution was stayed until seven o'clock a.m., February 21, 1989. On February 20, 1989, we vacated our prior panel opinion, granted a new certificate of probable cause, and agreed to rehear argument on the merits of Bertolotti's appeal.

**3.** The facts upon which Bertolotti's conviction and sentence are based are recounted in the Florida Supreme Court's opinion on direct appeal, *Bertolotti v. State,* 476 So.2d 130 (1985), and will not be repeated in their entirety here.

address first those claims that challenge the over-all validity of the state-court proceedings; second, those claims attacking specific errors during the guilt phase of the trial; and finally, those claims assigning constitutional error to the penalty phase of the trial.

■ Before turning to Bertolotti's specific claims, we note that the district court did not abuse its discretion by declining to hold an evidentiary hearing on the one issue that we agree presents a colorable claim for relief, the ineffectiveness claim. Although such a hearing often is necessary in a first federal habeas petition, it was not here. At the four-day hearing during the state collateral proceedings, counsel for Bertolotti presented several witnesses—including all three of his trial attorneys, a psychiatrist, and an expert on criminal defense; counsel also cross-examined the witnesses produced by the state. Bertolotti thus was afforded a full and fair opportunity to develop the basis of his ineffective-assistance claim. The district court, which was provided with the 665–page transcript of that hearing, fairly concluded that another hearing would not materially aid resolution of the ineffectiveness claim. *Smith v. Dugger*, 840 F.2d 787, 796 (11th Cir. 1988); *cf. Coleman v. Zant*, 708 F.2d 541, 545 (11th Cir.1983).

## A. ERROR AFFECTING THE ENTIRE PROCEEDING

### 1. *Ineffective Assistance of Trial Counsel (Claim 1)*

Bertolotti's defense was undertaken by attorneys Joseph DuRocher, Clyde Wolfe, and Peter Kenny. DuRocher, the elected public defender for the Ninth Judicial Circuit in Florida, initially interviewed Bertolotti and assigned the case to his assistants Wolfe and Kenny. Wolfe was responsible for the guilt phase of the trial and Kenny for the penalty phase. Bertolotti argues that counsel's performance was constitutionally defective for four reasons: (1) counsel overlooked substantial evidence of Bertolotti's psychological problems; (2) counsel overlooked evidence of Bertolotti's traumatic childhood; (3) counsel overlooked evidence of voluntary intoxication; and (4) counsel failed to present a defense to felony murder. Bertolotti claims that counsel's errors prevented the presentation of an effective defense, compromising the integrity of both the guilt and penalty phases of his trial.

Our resolution of Bertolotti's ineffectiveness claims is guided by the familiar two-prong test announced by the Supreme Court in *Strickland v. Washington:* to prevail, Bertolotti must first show that counsel's performance was so deficient that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" second, Bertolotti must show that "counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). To meet the second prong, Bertolotti must demonstrate prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. The *Strickland* standard is applicable to Bertolotti's claims of ineffectiveness both at the guilt stage and the penalty stage of his trial. *Id.,* 466 U.S. at 687, 104 S.Ct. at 2064.

a. *Insanity and diminished capacity.* —Bertolotti asserts that his trial counsel overlooked clues of mental incapacity that would have caused a reasonably competent lawyer to secure a psychiatric examination of his client. With the results that such an examination would have yielded, reasonably competent counsel could have presented insanity and diminished-capacity defenses at the guilt stage of the trial, and could have offered compelling mitigating evidence at the penalty phase of the trial. Although we conclude that Bertolotti cannot show prejudice, our resolution of the prejudice issue is determined substantially by our doubt about the strength of Bertolotti's evidence of psychological impairment. This doubt also colors our conclusions in regard to the performance of Bertolotti's counsel. Because much of the evidence relevant to the prejudice component of the *Strickland* test is also relevant to the performance component on this issue, resolution of the performance component

will not make our task appreciably more difficult, and we voluntarily address both prongs of the *Strickland* test.[4]

■ (1) *Attorney performance.*— Nine judges already have reviewed the performance of Bertolotti's attorneys. The unanimous Florida Supreme Court decided that counsel's performance was deficient; the state trial judge and the district judge both concluded that counsel's performance was adequate. Federal courts are not bound by the state determination of ineffectiveness, however (*Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070), and it is crucial to recognize that the role of the Florida Supreme Court in deciding questions of ineffective assistance differs fundamentally from the role of the federal court. Article Five, section fifteen of the Florida Constitution provides that "The supreme court shall have exclusive jurisdiction to regulate the admission of persons to the practice of law and the discipline of persons admitted." West's F.S.A. Const. Art. 5, § 15 (Supp. 1989). We have no such authority: as our Supreme Court has admonished, the duty of the federal court sitting in review of a state-court proceeding "is not to grade counsel's performance." *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069. Rather, the "ultimate focus" of our inquiry "must be on the fundamental fairness of the proceeding whose result is being challenged." *Id.,* 466 U.S. at 696, 104 S.Ct. at 2069.

■ The Florida Supreme Court analyzed the performance of Bertolotti's counsel under a state-law standard: "where there is evidence calling into question a defendant's sanity, defense counsel is bound to seek the assistance of a mental health expert." *Bertolotti v. State,* 534 So.2d at 388. Because some evidence called Bertolotti's sanity into question and counsel failed to seek the assistance of a mental health expert until the morning of the sentencing hearing, the Florida court

adjudged counsel's performance deficient. 534 So.2d at 389. The sixth-amendment standard for deciding a claim of defective performance is not nearly this formulaic; the federal standard asks whether "counsel's representation fell below an objective standard of reasonableness," and "[m]ore specific guidelines are not appropriate." *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2064. Our role in collaterally reviewing state judicial proceedings is not to point out counsel's errors, but only to determine whether counsel's performance in a given proceeding was so beneath prevailing professional norms[5] that the attorney was not performing as "counsel" guaranteed by the sixth amendment. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. Because the question asked by the state court is not the question asked by the federal court, the fact that the two courts apparently diverge does not necessarily signal a conflict.

■ That counsel's behavior transgressed a state-law duty is a factor we should consider in determining whether counsel was ineffective for the purposes of the sixth amendment, but because the sixth amendment does not guarantee perfect representation, an attorney error is not dispositive of the question of sixth-amendment ineffective assistance. *Adams v. Wainwright,* 709 F.2d 1443, 1446 (11th Cir.), *reh. in banc den.,* 716 F.2d 914 (11th Cir.1983), *cert. denied,* 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). Significantly, as the state-law duty violated by Bertolotti's counsel is not constitutionally compelled, it is less likely that Bertolotti's representation was fundamentally flawed. The Florida court cited the United States Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), as persuasive authority for its decision, but *Ake* does not require the Florida rule.

---

4. In the vacated order, the majority and the dissent agreed that this particular claim was the only claim presented by Bertolotti which had any merit; the majority did not address the competency of Bertolotti's counsel, resolving the claim on the ground that Bertolotti had shown no prejudice. *See Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069 (court should dispose of claim on prejudice prong if that course is "easier").

5. The state rule does not necessarily define a "prevailing professional norm" within the Supreme Court's use of the term. *Strickland,* 466 U.S. at 688, 104 S.Ct. at 2065 (referring to prevailing norms in terms of American Bar Association standards). Otherwise, the content of a fundamentally fair trial would vary from state to state.

The defendant in *Ake* behaved so strangely at arraignment and prior thereto that the trial judge, on his own motion, ordered the defendant "to be examined by a psychiatrist 'for the purpose of advising with the Court as to his impressions of whether the Defendant may need an extended period of mental observation.'" 470 U.S. at 71, 105 S.Ct. at 1090. The subsequent psychiatric report revealed that the defendant appeared to be "'frankly delusional.... He claims to be the "sword of vengeance" of the Lord and that he will sit at the left hand of God in heaven.'" *Id.* The psychiatrist diagnosed the defendant as a probable paranoid schizophrenic and recommended prolonged psychiatric evaluation to determine the defendant's competency to stand trial. The defendant was committed for observation; the chief forensic psychiatrist informed the trial judge that the defendant was psychotic, schizophrenic, suffering from delusions, rage, and poor control; the trial court held the defendant incompetent to stand trial. Six weeks later, the forensic psychiatrist recommended that the defendant (by then under medication) was competent to stand trial; the state resumed proceedings. Defense counsel told the court that he planned to raise the insanity defense on behalf of his client, and he requested state funds to hire a psychiatrist for the purpose of determining whether his client was insane at the time of the offense. The trial judge refused to appropriate funds; the United States Supreme Court subsequently held that the defendant's fourteenth-amendment rights had been violated: "We hold that when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. at 74, 105 S.Ct. at 1091–92.

■ *Ake* thus speaks to the responsibility of the state when the defendant exhibits compelling evidence of incompetency or insanity, the defendant's sanity is in issue, and the defendant is unable to afford the services of a mental-health expert. Because implicit in *Ake* is an assumption that counsel will recognize the applicability of the insanity defense to the facts of his particular case, counsel faced with facts comparable to those in *Ake* might be deficient as a matter of sixth-amendment law if he did not conduct a reasonable investigation into the possibility of raising an insanity defense. *Cf. Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. *Ake,* however, does not require that counsel faced with significantly less compelling evidence of mental instability—which evidence, as in the instant case, nonetheless could call his client's sanity into question—must move beyond a preliminary inquiry into an insanity defense and actually "seek the assistance of a mental health expert." *Cf. Bertolotti v. State,* 534 So.2d at 388. As the state would not be required by the federal constitution to fund an examination under such circumstances, *Moore v. Kemp,* 809 F.2d 702, 712 n. 8 (11th Cir.) (in banc), *cert. denied,* 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987), counsel cannot be *per se* deficient for not requesting an examination. When fundamental fairness does not require that a defendant be given a benefit, fundamental fairness is not threatened by the defendant's failure to receive that benefit if the failure is due to counsel's reasonable decision not to request it or the court's reasonable decision not to grant it. *See generally Clark v. Dugger,* 834 F.2d 1561, 1563–65 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); *Bowden v. Kemp,* 767 F.2d 761, 765 (11th Cir.1985).

■ This is not to say that vigorous counsel could never move for the appointment of an expert if he doubts that his client can make out an *Ake* showing; nor do we in any sense question Florida's decision to hold its practitioners to a higher standard. Rather, the federal standard by which we measure counsel's decision not to go forward with a full-fledged inquiry into his client's mental health remains that announced by the Supreme Court in *Strickland:* "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

*Id.,* 466 U.S. at 691, 104 S.Ct. at 2066. In *Strickland* as in the instant case, the petitioner argued that his counsel was ineffective for failing to secure a psychiatric examination. *Id.,* 466 U.S. at 675, 104 S.Ct. at 2058. Evaluating the claim, the Supreme Court held that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Id.,* 466 U.S. at 691, 104 S.Ct. at 2066. Specifically, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*

 Turning to appraise the reasonableness of counsel's decision not to secure a psychiatric examination until the morning

of Bertolotti's sentencing hearing,[6] we view the facts "as of the time of counsel's conduct," recognizing that "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland,* 466 U.S. at 690, 104 S.Ct. at 2066. Bertolotti's burden is to "overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.,* 466 U.S. at 689, 104 S.Ct. at 2065 (*quoting Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed. 83 (1955)).

Bertolotti has identified several signals that he argues should have led Kenny and Wolfe to secure a psychiatric examination prior to trial.[7] A brief review of the facts surrounding the murder is needed to place the signals in context. The victim, found in

6. The dissent submits that "[c]haracterizing counsels' accidental failure to secure a mental exam until the morning of the sentencing hearing as a 'decision' that must be evaluated for 'reasonableness' oversteps the settled law of this Circuit regarding this issue." Dissent at 1531. We explain *infra* that counsel's failure to obtain a mental examination prior to trial is understandable because the total picture confronting counsel did not suggest the necessity of such an examination to Bertolotti's defense on the merits; the circumstances were not such as to call for a documented, plotted-out strategic choice between mental examination or no mental examination, which is what the dissent apparently would like to review. Therefore, without joining an abstract debate over the meaning of the term "decision," we think counsel's failure to schedule a mental examination prior to the guilt phase of the trial is properly judged under a standard of reasonableness.

7. Bertolotti attaches some significance to the fact that counsel requested a psychiatric examination and the court granted that request, but counsel failed to schedule the examination until the morning of the sentencing hearing. Also, the dissent emphasizes that "the fact that a psychiatric evaluation was both requested and granted and the fact that a psychiatrist was obtained to conduct an evaluation right before the sentencing hearing belies a conclusion that counsel had no reason to suspect mental illness." Dissent at 1530. As the following colloquy between attorney Wolfe and the state attorney at the evidentiary hearing indicates, and as *the district judge found,* Wolfe simply asked for the examination as a matter of course:

Q: Mr. Wolfe, why did you file a motion to have Mr. Bertolotti examined?

A: Prior to accepting this assignment, I had gone up to the public defender's office in Jacksonville in the Fourth Circuit, Duval County, and they had prepared from their word processor a whole list of motions. And I spent the day with the chief assistant up there, Bill White, discussing representation of this type of case. And that was the type of motion that they had indicated to me should be filed in every case to begin an investigation.
It didn't dawn on—I didn't realize how much importance should be placed on that until later and how that should be independently followed up in addition to the basic factual case preparation.

Q: Mr. Wolfe, at the time that you filed that motion, did you have facts in your possession, based upon your interview with Mr. Bertolotti, based upon what you knew about the facts of this case and based upon the background information that you had, that would substantiate and support that motion?

A: Well, the threshold for that motion is not that great, and—or at least my reading of the rules is that the threshold requirements for that particular motion are not that great, so I would have to say yes with a liberal interpretation of the rules.

Q: Did you think Mr. Bertolotti was incompetent?

A: Incompetent to stand trial?

Q: Yes, sir.

A: I didn't think so.

Q: Did you think Mr. Bertolotti, based upon what you knew of the facts and how this crime was committed, was insane at the time of the commission of this crime?

A: From what I knew at the time, I don't think so.

her house by her husband, had been repeatedly stabbed with two knives; one broke and the other was left in the body. She was naked from the waist down and forensic tests revealed that intercourse had taken place, although there was no evidence of physical trauma. The victim had also been strangled and beaten, and bore bruises that indicated she had fought back during the attack. She had been robbed of thirty dollars, and her car had been stolen. A few days later, Bertolotti was arrested after his girlfriend informed police that she suspected his involvement in the murder. He gave the police two voluntary confessions which were preserved on audio tape; in the first confession, he admitted murdering the victim, in the second, he admitted the murder and also attempted to implicate his girlfriend. *See Bertolotti v. State*, 476 So.2d at 131–32.

In conjunction with these facts, Bertolotti argues that counsel unreasonably disregarded the following signals: first, the audio tapes of his confession reveal that he was in an extremely emotional state while recounting the murder. Second, Bertolotti stated during the first taped confession that "I just, I don't know what was happening to me." Third, his explanation of the facts of the crime was inherently unbelievable. Fourth, Bertolotti's girlfriend told Wolfe that she believed Bertolotti needed psychiatric help, and had a "split personality." Fifth, Bertolotti was placed under psychiatric observation while being held for the murder. Sixth, the number of stab wounds in the victim should have indicated mental instability.

The audio tapes do indeed reveal that Bertolotti cried and moaned while explaining his crime to the police interrogators. Bertolotti's voice is low and trembling, and as the narrative proceeds to the actual murder, Bertolotti perceptibly becomes more distraught. Throughout the entire interrogation, however, Bertolotti plainly appears to understand what he is doing, who he is talking to, and what he is talking about. His responses to the interrogator's questions are consistently coherent. In the second taped confession, during which Bertolotti explains why he did not tell the full story in his first confession and also implicates his girlfriend in the wrongdoing, his tone is calm and rational. The tapes are at least as consistent with the proposition that Bertolotti was remorseful or frightened as they are with the proposition that Bertolotti had mental problems.

His statement that he did not "know what was happening" to him raises the possibility of mental illness, but in light of Bertolotti's confession admitting that he knew he had killed the victim when he left the house, the statement is hardly a sure-fire sign of legal insanity and could simply be an effort to shirk responsibility for the crime. In the same way, the fact that a defendant offers an unbelievable explanation for his actions is hardly unusual in itself—Bertolotti first told the police interrogators that the victim invited Bertolotti into her house to use the telephone and get a drink, whereupon he attacked her with a kitchen knife; in an effort to satisfy Bertolotti, the victim offered him jewelry and began to undress. The victim began to talk with Bertolotti and encouraged him to pray with her, but then tried to wrest the knife from him. He resisted, she screamed, and he began to stab. The first knife broke, but the victim continued to make noise and began to get up from the floor. Bertolotti found another knife and continued to stab. He then hit the victim in the head with a beer stein. In Bertolotti's second confession, he told the police that he and his girlfriend entered the victim's house in order to steal some money. The victim, who was at home, offered to have intercourse with Bertolotti in order to appease him, at which point the girlfriend became enraged. As Bertolotti and his girlfriend prepared to leave the house, the victim grabbed the girlfriend by the legs and the girlfriend ordered Bertolotti to stab the victim. Bertolotti's stories, while incredible, are not so bizarre that counsel should immediately suspect that his client is mentally ill, "unless one were to adopt the dubious doctrine that no one in his right mind would commit a murder." *Ake*, 470 U.S. at 90, 105 S.Ct. at 1100 (Rehnquist, J., dissenting).

Reasonable counsel could have discounted much of what Bertolotti's girlfriend had

to say; Bertolotti attempted to implicate her in the murder, and she herself turned in Bertolotti to the police, collecting a thousand-dollar reward for her trouble. She was probably not too sympathetic to Bertolotti's plight, and she had her own reasons for wanting Bertolotti to appear factually responsible for the crime.

Bertolotti was placed under psychiatric observation following his arrest, but the psychologist on the sheriff's staff who ordered the observation testified that he did so as a matter of routine, in order to "follow up on anything that [he] may have missed when [he] saw" Bertolotti. Bertolotti now states that he was placed under suicide watch on the day of his arrest. The staff psychologist did not recall placing Bertolotti under a suicide watch; instead, the psychologist was asked to interview Bertolotti after Bertolotti told a nurse questioning him about his background that on a previous occasion he had contemplated suicide. The fact that Bertolotti was placed under any type of psychological observation should have been a signal to inquire into Bertolotti's mental state, but it does not amount to much more. Similarly, the number of stab wounds in the victim could have raised the possibility that Bertolotti committed the murder in a frenzied rage, but in light of Bertolotti's statement to the police that he stabbed the victim so many times because of the difficulty in accomplishing the murder, reasonable counsel need not have seized upon this evidence as a definite indicator of mental problems.

Against this evidence of mental impairment, reasonable counsel would have recognized that Bertolotti's own actions following the murder showed that he appreciated the criminality of his conduct: he stole the victim's car and abandoned it where it would be stolen; also, in his confession to the police, he explained how he attempted to cover up evidence of his participation in the murder. The day following the murder, moreover, Bertolotti visited a minister, telling the minister that he had problems and asking for the minister's prayers. This evidence is important for two reasons: first, reasonable counsel could have taken this information to mean that Bertolotti was aware of the criminality of his conduct, and second, reasonable counsel would have realized that the prosecution could have used this evidence to rebut an insanity defense.

The foregoing evidence, considered as a whole, is sufficiently equivocal that reasonable counsel would not have been under a duty to secure a psychiatric examination of Bertolotti for the purpose of introducing an insanity defense or negating Bertolotti's specific intent to commit any of the crimes with which he was charged.[8] *Cf. Ake*, 470 U.S. at 74, 105 S.Ct. at 1091–92. The foregoing, however, probably suggested the need for some further inquiry into Bertolotti's mental state. The record indicates that counsel did make preliminary inquiries into Bertolotti's mental condition, but then abandoned the effort. As this decision was made "after less than complete investigation" of Bertolotti's mental health, *Strickland* requires an assessment whether "reasonable professional judgments support[ed] the limitations on investigation." *Id.*, 466 U.S. at 691, 104 S.Ct. at 2066.

Recalling that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions," 466 U.S. at 691, 104 S.Ct. at 2066, we find it dispositive that both Bertolotti and his parents informed counsel that Bertolotti had never experienced any previous mental problems; Bertolotti's parents also told counsel that Bertolotti was of above-average intelligence. *See Daugherty v. Dugger*, 839 F.2d 1426, 1431 (11th Cir.), *reh. in banc den.*, 845 F.2d 1032 (11th Cir.), *cert. denied*, ──

8. The dissent states that "[i]n an attempt to dismiss the evidence as insufficient to alert the attorneys to the possibility of Bertolotti's insanity, the majority dissects the evidence and discusses the insufficiency of each 'alleged signal' of mental instability. This seriatim analysis wholly fails to address the bigger picture. The cumulative effect of all the evidence undeniably points to the necessity of ordering a mental health evaluation." Dissent at 1531. We agree with the dissent that such a "seriatim analysis" would be incorrect. As the majority opinion demonstrates, however, we have considered the *totality* of the evidence available to counsel at the time counsel planned trial strategy.

U.S. ——, 109 S.Ct. 187, 102 L.Ed.2d 156 (1988); *cf. Elledge v. Dugger,* 823 F.2d 1439, 1445 (11th Cir.) (counsel defective for mounting psychiatric defense yet failing to interview relatives or seek expert assistance), *mod. on other grounds and reh. in banc den.,* 833 F.2d 250 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988). Counsel did not have any reason to think that Bertolotti was less than forthcoming; counsel testified that he interviewed Bertolotti numerous times, found Bertolotti communicative and appropriately behaved, and was "very comfortable with Mr. Bertolotti." *Cf. Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.) (counsel testified that he thought client was retarded), *reh. in banc den.,* 792 F.2d 1126 (11th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). Furthermore, counsel spoke with a staff psychologist at a facility where Bertolotti previously had been incarcerated, who indicated that Bertolotti had adjusted well to the prison setting, served as a peer-counselor, and was in fact so trusted by the prison authorities that he was allowed access to scissors and razors so he could work as a barber. Further inquiry would have revealed that this same psychologist had at one point thought that Bertolotti exhibited "indications of the possibility of disorganization under stress, cyclic bizarre and/or aggressive behavior and sexual dysfunction," but the psychologist did not volunteer this information and counsel was not aware of it. Although it is difficult to recreate the circumstances of the interview, counsel's failure to ask this psychologist specifically whether he had noticed any mental problems in Bertolotti might be considered unreasonable. *See Thompson,* 787 F.2d at 1451 n. 2. The failure was likely harmless in any event: the psychologist concluded that "[a]ll of these indications have now disappeared, and it is likely that [Bertolotti] will do well in a work release setting. However, it should be noted that persons with [sociopathic] profiles similar to [Bertolotti's]

present one, have extremely high recidivism rates, usually for crimes of a property offense nature." Even this information would have been an equivocal indicator of insanity at the time of the murder of Carol Ward.

In short, counsel testified that "[w]e had done a great deal of investigation and deposition work as to the events prior to the offense and afterwards, and those matters did not trigger an insanity defense for me.... An insanity defense would have seemed to me inconsistent with the facts that would ... otherwise have been presented at trial." On the basis of counsel's inquiry and the evidence that Bertolotti appreciated the wrongfulness of his conduct, we cannot say that counsel behaved unreasonably in not securing a psychiatric examination for the purpose of introducing an insanity defense or for the purpose of negating premeditation. *Stephens v. Kemp,* 846 F.2d 642, 653 (11th Cir.) (no further duty of inquiry for purposes of guilt phase of trial when preliminary investigation of psychiatric evidence reveals that petitioner was hospitalized for psychiatric problem between four and six months prior to crime, but psychiatric report indicates no evidence of severe mental illness), *reh. in banc den.,* 849 F.2d 1480 (11th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). As the state judge orally concluded after the evidentiary hearing in the collateral proceedings, counsel "attempted to save the life of their client by realistically arguing that this was a second-degree murder rather than a first-degree murder and opted not to take the unrealistic approach of not guilty by reason of insanity." Under the circumstances, the decision of Bertolotti's counsel can be considered sound trial strategy.[9]

Even though the totality of the evidence discouraged counsel from mounting a psychologically based defense to the substantive crimes, evidence of mental impairment could still have been used during

**9.** Bertolotti argues that without securing a psychiatric examination, counsel could not reasonably have opted to pursue a defense strategy based on lack of premeditation. The *Strickland* Court rejected a similar argument: counsel there made a strategic choice to rely on his client's extreme emotional distress, but counsel's decision not to seek more "psychological evidence than was already in hand" was reasonable. *Id.,* 466 U.S. at 699, 104 S.Ct. at 2070.

the sentencing phase of the trial. *See Stephens,* 846 F.2d at 653 (greater duty of inquiry into client's mental health imposed for penalty phase of trial). Because of the evidence that Bertolotti appreciated the wrongfulness of his acts, of course, counsel could still quite reasonably have entertained serious doubt about the efficacy of such evidence at the sentencing phase; nonetheless, counsel may have been able to evoke the jurors' sympathy or rebut some of the state's aggravating evidence with testimony that Bertolotti suffered psychological problems. Counsel attempted to have Bertolotti interviewed by a psychiatrist on the morning of the sentencing hearing, but Bertolotti refused to be seen. With a total lack of evidence that Bertolotti was not a competent decision-maker on the morning of the sentencing hearing, we cannot say that counsel behaved unreasonably by not taking further steps to encourage Bertolotti to undergo an examination. *Cf. Faretta v. California,* 422 U.S. 806, 820, 95 S.Ct. 2525, 2533, 45 L.Ed.2d 562 (1975) (recognizing a right to *pro se* representation: the "language and the spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally"); *Foster v. Strickland,* 707 F.2d 1339, 1343 (11th Cir.1983) (lawyer bound by client's decision against insanity defense), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); American Bar Association Model Code of Professional Responsibility EC 7–7 & 7–8.

▪ (2) *Prejudice.*—To demonstrate prejudice, Bertolotti relies largely on the testimony of Dr. James R. Merikangas, a psychiatrist who prior to the state evidentiary hearing interviewed Bertolotti for one hour and fifteen minutes, spoke with members of Bertolotti's family, and reviewed documents relating to Bertolotti's case. Dr. Merikangas testified that Bertolotti was insane at the time he murdered Carol Miller Ward. Bertolotti argues that had Dr. Merikangas's testimony been presented to the jury, there is a reasonable probability that the jury would have acquitted him

on grounds of insanity. Even had the jury not acquitted him, there is a reasonable probability that Dr. Merikangas's testimony would have saved Bertolotti from the electric chair, because the jury may have found Bertolotti guilty only of second-degree murder, or may have found during the penalty phase of the trial that mitigating circumstances outweighed the aggravating circumstances.

Dr. Merikangas opined that Bertolotti was a schizophrenic who had a catastrophic reaction to the stress he experienced while hearing the victim scream. He reacted by stabbing the victim repeatedly, and while he was in the process of killing her, he was unable to discern right from wrong. Dr. Merikangas relied upon several factors to conclude that Bertolotti was schizophrenic. Bertolotti's mother briefly had been committed to a psychiatric hospital for schizophrenia in the late nineteen-sixties. Bertolotti suffered from delusions, did not exhibit appropriate reactions, and was "religiously confused." He had been reared in an overly strict and overly religious household, and was subjected to "psychological abuse" by his father; he would tell lies for self-aggrandizement or to accept the blame for wrongs he had not done, would cry easily, and did poorly in school despite possessing above-average intelligence. He never had a girlfriend, and he used several aliases.

Dr. Merikangas explained the basis of his opinion on the catastrophic-stress reaction as follows:

I believe my opinion is that [Bertolotti] is a schizophrenic who had a catastrophic reaction to stress, that people with this disorder are predisposed to break down under conditions of stress and go berserk, as this man apparently did; and that this is borne out not only by his recounting of the crime and the several different versions which he used, but by the facts that are documented in the autopsy and the police report of a berserk rage, stabbing multiple times with two different knives, for instance; his actions after the crime of leaving bloodstains all around and leaving the weapon there and going home and hiding these

clothes; his girlfriend, who is not a trained psychologist, observing that there was something weird and strange about him; his blubbering and whining and decompensating while giving a voluntary confession to the police the first time, and then coming back with another different confession that tried to implicate his girlfriend after he had time to consider it and calm down; and his past history all point to the same conclusion. Dr. Merikangas's testimony is vulnerable to well-considered attack on several fronts and we doubt that a jury would find it convincing.

■ All psychiatrists and psychologists who testified at the evidentiary hearing agreed that schizophrenia can be hereditary; therefore, that Bertolotti's mother was once hospitalized with the illness is probative of the proposition that Bertolotti possibly suffers from the same illness. Beyond this evidence of schizophrenia, however, the evidence Dr. Merikangas relied upon in formulating his views is extremely weak. Bertolotti's alleged delusions, for example, consist chiefly of his belief that he could control those around him and influence the outcome of the evidentiary hearing. Dr. Merikangas was not aware of these delusions when he was deposed by attorneys for the state shortly before the evidentiary hearing; Bertolotti's attorney informed someone in his office who in turn told Dr. Merikangas that Bertolotti had related the delusions to counsel sometime between the deposition and the hearing. Even though Dr. Merikangas's opinion is not necessarily inadmissible because he relies on rather questionable hearsay testimony in formulating his belief, see Fed.R. Evid. 703, the trustworthiness of the basis for Dr. Merikangas's opinion is certainly something for the court to consider in deciding whether a fact-finder would credit the testimony. *Elledge v. Dugger*, 823 F.2d 1439, 1447 (11th Cir.1987) (value of doctor's testimony undercut by doctor's reliance on uncorroborated facts). The remaining factors Dr. Merikangas relied upon in concluding that Bertolotti suffered from delusions are unexceptional; these involved Bertolotti's use of aliases and his lying, evidenced in various prison records,

about his own employment history, his father's employment, his mother's educational background, and the size of his family.

Bertolotti's alleged inappropriate reactions are also the subject of some dispute. Although Dr. Merikangas's testimony indicates that Bertolotti was displaying inappropriate responses during the evidentiary hearing, this behavior seems contradictory to the behavior evidenced on the taped confession, and the behavior otherwise testified to by trial counsel, the interrogating police officer, and a psychiatrist who interviewed Bertolotti for the state. The sheriff's staff psychologist did make the notation "flat affect" while interviewing Bertolotti after his arrest, which would indicate that Bertolotti showed little or no emotion during the interview, but the psychologist testified that Bertolotti's reaction was not atypical. As to Bertolotti's "religious confusion," he apparently could not decide whether he wanted to be Catholic or Jewish, but, as Dr. Merikangas agreed, it is not unusual for people placed in jail to reassess their basic religious beliefs.

Regarding the severity of the home in which Bertolotti was reared, there is no strong evidence that Bertolotti was physically abused, and Dr. Merikangas did not place much emphasis on such evidence in forming his opinion. Instead, Dr. Merikangas testified that "spanking a child when he needs it" can be considered "psychological abuse." Dr. Merikangas's view that the home was overly strict is based on information that Bertolotti's "father and ... mother would look under the bed to see if there [was] any dust before the children would be allowed to go out and play." Further, Dr. Merikangas was told that Bertolotti and his siblings were locked out of the house during the day so they could not sully the interior. As to Dr. Merikangas's charge that the household was "overly religious," the testimony merely shows that the children were taken to long church services on Sundays, and the father subscribed to the maxim that spared rods spoil children. The remaining bases for Dr. Merikangas's diagnosis of schizophrenia— that Bertolotti was an underachiever and unpopular with girls—concededly are consistent with a wide variety of problems.

Dr. Merikangas opined that Bertolotti was unable to discern between right and wrong at the time of the murder because of his catastrophic reaction to stress. A forensic psychologist called by the state (who had not interviewed Bertolotti personally but who appears, upon the cold record, to be the least partisan witness at the hearing) had trouble with the notion that the victim's screaming could have precipitated Bertolotti's reaction:

It's also hard for me to put [the victim's screaming] into a [catastrophic-stress] model in view of the total situation that was going on. There was obviously an attack involved and normally when people are attacked, they make some kind of audible as well as physical response to it. So one would expect potentially, if you go after someone, they're probably going to scream. And to see that as a catastrophic stresser is very difficult because we would tend to see that as an expected event.

The factors identified by Dr. Merikangas as consistent with his belief that Bertolotti had suffered a catastrophic reaction to stress are likewise consistent with the proposition that Bertolotti stabbed the victim repeatedly because of the difficulty in killing her, tried to hide his blood-stained clothes so he would not be detected, experienced remorse while recounting the crime, and later, upon reflection (tempered by anger that his girlfriend had betrayed him) attempted to implicate the girlfriend in the murder.[10]

Bertolotti's counsel put the same question to each of the state's three mental-health experts: counsel asked the experts whether their disagreement with Dr. Merikangas's testimony necessarily meant that Dr. Merikangas was wrong, and if not whether they agreed that because psychiatry and psychology are "arts, not sciences," reasonable professionals could differ in their diagnoses. Each of the state's witnesses agreed with the latter proposition; indeed, it is unexceptional to anyone with a modest amount of trial experience. Partisan psychologists and psychiatrists will often disagree in courts of law. Before we are convinced of a reasonable probability that a jury's verdict would have been swayed by the testimony of a mental-health professional, we must look beyond the professional's opinion, rendered in the impressive language of the discipline, to the facts upon which the opinion is based. *Elledge*, 823 F.2d at 1447.

In the instant case, we are not convinced that there is a reasonable probability that Dr. Merikangas's testimony would have had an effect on the jury's verdict of first-degree murder.[11] The testimony itself is

10. In the course of his testimony, Dr. Merikangas made passing reference to other factors in support of his diagnosis. He placed some reliance on a belief that Bertolotti had been under the influence of a quaalude at the time of the murder. The only evidence supporting this proposition is the self-serving statement Bertolotti made in his first confession; the state offered evidence at trial rebutting the notion that Bertolotti had consumed a quaalude, and at the evidentiary hearing, one of the state's expert witnesses testified that Bertolotti told him he had lied about taking the quaalude. The Florida Supreme Court concluded as a matter of state law that Bertolotti had not produced enough evidence of intoxication to warrant an intoxication instruction. *Bertolotti v. State*, 534 So.2d at 387. *See infra* Part II.A.1.b.

Dr. Merikangas also referred to Bertolotti's second confession, in which he implicated his girlfriend, as evidencing the circumstances of extreme duress which precipitated Bertolotti's murder of Carol Ward. Bertolotti told police that his girlfriend ordered him to kill the victim because the victim had grabbed the girlfriend's legs. We doubt a jury would conclude, after hearing audio tapes of both confessions, that Bertolotti's first confession was a complete fabrication and that his second confession more closely represented the true circumstances of the crime.

11. The dissent is "disturbed by the fact that, in reaching its conclusion, the majority has impermissibly invaded the province of the jury." Dissent at 1534. However, we point out that *Strickland* requires habeas petitioners not only to show defective performance of counsel, but also to demonstrate prejudice resulting therefrom. 466 U.S. at 687, 104 S.Ct. at 2064. To gauge prejudice, the federal court must determine whether there is a "reasonable probability" that the newly proffered evidence would have changed the jury's decision. 466 U.S. at 694, 104 S.Ct. at 2068. The dissent does not suggest how the court can complete this task without "invading the province" of the jury. At any rate, the jury has already spoken in this case. Our only license is to determine, within the bounds dictated by Supreme Court and Eleventh Circuit

internally weak, and it would have been directly rebutted by similarly qualified experts. *Elledge*, 823 F.2d at 1447. We doubt that a jury would have acquitted Bertolotti on grounds of insanity. *Bundy v. Dugger*, 850 F.2d 1402, 1412 (11th Cir.), *reh. in banc den.*, 859 F.2d 928 (11th Cir. 1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989). We also doubt the existence of a reasonable probability that the jury would have convicted Bertolotti of a lesser-included, non-capital offense on the basis of Dr. Merikangas's testimony. Dr. Merikangas did testify that Bertolotti was capable of forming the intent to rob the victim, and in fact he had "no question that [Bertolotti] had the desire to rob Carol Ward." Therefore, even if the psychiatrist's testimony would have supported the inference of diminished capacity, precluding a probable conviction of premeditated murder, Dr. Merikangas's testimony would not have changed a verdict of felony murder, which is also death-eligible under Florida law.

■ Turning to the sentencing phase of Bertolotti's trial, we see no reasonable probability that the evidence discussed above would have resulted in a life sentence for Bertolotti.[12] Because the evidence of psychological impairment would have been strongly disputed by the state's expert witnesses, and because the evidence itself has substantial internal weaknesses, we question whether counsel would have presented the evidence to the jury even had counsel possessed it. Attorney Kenny testified that his penalty-phase tactical theory was to portray Bertolotti as a normal man

from a happy and loving family, whose life deserved to be spared; in light of the weakness of Bertolotti's psychiatric evidence, this tack would continue to be a reasonable strategy.

Assuming counsel would have produced the evidence, however, we nonetheless agree with the district court's factual conclusion that a jury likely would have found the state's expert testimony more logical and credible than the testimony offered in Bertolotti's behalf;[13] at most, the experts from opposing camps would have offset one another.[14] *Bundy*, 850 F.2d at 1409, 1412; *Daugherty*, 839 F.2d at 1431; *Elledge*, 823 F.2d at 1447–48. Moreover, in view of the three statutory aggravating circumstances presented to the jury—a disturbing record of prior criminal convictions, three felonies accompanying the victim's murder, and the especial heinousness, atrocity and cruelty of the murder—Bertolotti has not established a reasonable probability that equivocal evidence of mental instability would have tipped the jury's weighing of aggravating and mitigating circumstances in his favor. *Thompson*, 787 F.2d at 1453 (no reasonable probability that evidence of troubled youth, unsavory codefendant, and mental incapacity would have altered jury's recommendation of death sentence for brutal torture-murder); *Elledge*, 823 F.2d at 1447. Even if the proffered evidence would have affected the jury's consideration of the third aggravating circumstance, the other two would remain amply supported. *Cf. Ford v. Strickland*, 696 F.2d 804, 815 (11th Cir.) (in banc)

---

precedent, whether the performance of Bertolotti's counsel deprived him of a fundamentally fair trial.

**12.** The jury voted nine to three to recommend the death penalty; had three jurors voted differently, the recommendation would have been for life. We reject the argument that analysis of the "reasonable probability" of a different verdict should vary according to the number of jurors voting to impose the death penalty: if there is a reasonable probability that one juror would change his or her vote, there is a reasonable probability that a jury would change its recommendation. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2068 ("The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and

impartially applying the standards that govern the decision. It should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency.").

**13.** Moreover, after listening to four mental-health experts including Dr. Merikangas, the state trial judge found Dr. Merikangas's testimony "preposterous."

**14.** Bertolotti contends that none of the state's experts rebutted Dr. Merikangas's opinion in regard to the availability of death-mitigating psychiatric evidence. It is clear that the testimony of any of the state's witnesses could be used at the penalty phase to contradict Bertolotti's mitigation evidence.

(resentencing not necessarily required when one aggravating circumstance is struck on appellate review), *cert. denied,* 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983).

▮ b. *Remaining grounds of ineffective assistance.*—We may quickly dispose of Bertolotti's remaining charges of ineffective assistance of counsel. Testimony at the evidentiary hearing showed that counsel conducted a reasonable investigation into the circumstances of Bertolotti's childhood; counsel interviewed Bertolotti's parents personally and also had them complete a lengthy questionnaire concerning Bertolotti's past experiences.

▮ The evidence does not show that counsel unreasonably failed to raise a voluntary-intoxication defense to the specific-intent crimes of murder, robbery and burglary. The Florida Supreme Court held that the evidence of intoxication was insufficient to warrant a voluntary-intoxication instruction. *Bertolotti v. State,* 534 So.2d at 387. Bertolotti does not now show that counsel overlooked any other evidence of intoxication; indeed, Bertolotti later claimed that he had lied when he told police officers that he was under the influence of a quaalude at the time of the murder.

▮ Nor does Bertolotti's final ineffectiveness claim have merit. Bertolotti argues that counsel simply did not grasp the fact that felony murder, like premeditated murder, is death-eligible under Florida law; as a consequence, Bertolotti argues that counsel failed to mount a defense against felony murder. During a hearing on several pending pre-trial motions, however, Attorney Wolfe informed the court that the state could prove capital murder by proving felony murder. Furthermore, the record shows that counsel sought to raise a reasonable doubt whether Bertolotti had committed the three charged predicate felonies. Bertolotti has shown neither attorney error nor prejudice.

2. *Caldwell Violations Occurring Throughout the State Proceedings (Claim 8)*

▮ Bertolotti argues that the prosecutor and judge impermissibly diminished the jury's sense of responsibility for the awesomeness of its task, in violation of *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Florida Supreme Court found this claim procedurally barred because it was not raised on direct appeal; alternatively, the Florida court refused to address the merits of Bertolotti's *Caldwell* claim because Florida maintains that *Caldwell* is inapplicable to its statutory scheme, in which the trial judge imposes the death sentence. *Bertolotti v. State,* 534 So.2d at 387 n. 2.

Although we question the strength of Bertolotti's claim,[15] the doctrine of procedural bar prevents us from addressing the merits. In *Dugger v. Adams,* the Supreme Court recently held that Florida petitioners generally do not have cause for failing to object to *Caldwell*-type errors during pre-*Caldwell* trials, because Florida has long recognized that a defendant must object if the judge misinstructs jurors on applicable state law. —— U.S. ——, 109 S.Ct. 1211, 1215–16, 103 L.Ed.2d 435 (1989). Similarly, Florida has long held that the defense must object to improper prosecutorial remarks. *E.g., Rogers v. State,* 158 Fla. 582, 30 So.2d 625, 628–29 (1947). As Bertolotti suggests no other manner of satisfying the cause-and-prejudice test of *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), we conclude that Florida's decision constitutes an adequate and independent ground for decision.

3. *Improper Denial of Motion for a Change of Venue and Improper Limitation of Bertolotti's Right to Voir Dire the Jury Venire (Claim 11)*

News stories about the murder of Carol Miller Ward were carried on television and printed in the newspapers following discovery of the crime and following Bertolot-

---

**15.** The trial judge instructed the jury as follows: The fact that your recommendation is advisory does not relieve you of your solemn re-

sponsibility, for the court is required to and will give great weight and serious consideration to your verdict in imposing sentence.

ti's arrest and confession; a local television station also carried a report on Bertolotti's impending trial shortly before jury selection began. Prior to jury selection, counsel moved for a change of venue and for individual voir dire. At a hearing on March 19, 1984, the trial judge granted Bertolotti's motion for individual voir dire,[16] but, concluding that Bertolotti had not demonstrated prejudice, denied the motion for change of venue. The judge informed defense counsel that should difficulty in obtaining an impartial jury "appear to be the case during voir dire, ... you are entitled to raise the issue at that time." On March 26, prior to voir dire, counsel renewed the motion for a change of venue. At a subsequent hearing in open court, the trial judge reviewed video tapes of televised news reports that aired in September and October 1983 and March 1984, but again denied Bertolotti's motion for a change of venue without prejudice to reconsider should voir dire show that the venire was biased. Jury selection began later that day.

Of fifty prospective jurors called, individual voir dire revealed that thirteen were sufficiently biased to be excused for cause; of that number, six were excused because of a preconceived notion of Bertolotti's guilt. In response to questions posed by the judge and by the attorneys, the remaining thirty-seven jurors indicated that they could determine Bertolotti's guilt or innocence based upon the evidence adduced at trial and not upon any preconception. The attorneys selected a panel of twelve jurors and two alternate jurors; of this number, three had no knowledge of the murder, nine had some knowledge of the murder, and two knew of the existence of Bertolotti's confession. Counsel did not move for a change of venue after voir dire commenced.

The individual voir dire conducted by Bertolotti's lawyers insured that

Bertolotti was tried by an impartial jury under the sixth and fourteenth amendments; accordingly, Bertolotti has not demonstrated that he was actually prejudiced by the trial judge's denial of his motion for a change of venue. Importantly, if jurors can lay aside preconceptions and base their verdict on the evidence adduced at trial, they need not be completely unaware of the facts of a given case. *Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975). Perhaps recognizing the difficulty in proving actual prejudice on the basis of the voir dire transcript, Bertolotti submits that his case "is of that rare breed which does exceed the extremely high threshold test of presumed prejudice requiring a change of venue." *Coleman v. Kemp,* 778 F.2d 1487, 1489 (11th Cir.1985), *reh. in banc den.,* 782 F.2d 896 (11th Cir.), *cert. denied,* 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986). We disagree.

The record contains two news articles that appeared in the Orlando *Sentinel* in October of 1983, five months before the trial. The articles, one of which appeared on the front page of the *Sentinel,* detail facts surrounding the murder and Bertolotti's subsequent arrest, and also recount Bertolotti's prior criminal record. Beyond this evidence, the record contains affidavits of Bertolotti and two public defenders in which the affiants state that "extensive publicity" surrounded the murder investigation. The record does not contain the video tapes viewed by the trial judge; the judge indicated, however, that the tapes contained references to statements attributed to Bertolotti. The record is devoid of circulation figures for the newspaper and audience-share figures for the televised newscasts.

This showing is plainly inadequate to establish a claim of presumed prejudice under our decisions.[17] In *Bundy,* the petitioner

---

16. Veniremen were brought into the courtroom one at a time and examined on the subjects of pretrial publicity and personal feelings about the death penalty. Veniremen were admonished not to discuss the individual proceeding with the remainder of the venire.

17. In *Coleman,* rural Seminole County, Georgia, site of the trial, was literally saturated with

virulent press reports of the crime for which the habeas petitioner was indicted, tried, and sentenced to death. As the *Coleman* court's lengthy narrative demonstrates, the case had become notorious throughout Georgia. 778 F.2d at 1491–1537. A local newspaper that reached eighty-five percent of the households in Seminole County, the Donalsonville *News,* repeatedly published front-page articles, including one

produced much more evidence of pretrial publicity than Bertolotti now presents. 850 F.2d at 1425. Six months prior to jury selection in the proceeding under attack in *Bundy*, a public television station had broadcast half-hour summaries of another of the defendant's trials; the commercial television stations likewise provided extensive coverage of the earlier trial and the defendant also presented several newspaper accounts from the local newspaper. As in the instant case, the articles and broadcasts were factual in nature and did not include editorial commentary on the defendant's guilt. An opinion poll suggested that ninety-eight percent of the county residents were familiar with the name "Bundy," fifty-eight percent knew that the defendant had been involved in the earlier case, and thirty-one percent believed that the defendant's earlier conviction strongly indicated that he was guilty in the case under collateral attack. We rejected this evidence, noting that "prejudice is not presumed simply because the defendant's criminal record is well publicized." *Id.*, 850 F.2d at 1425 (*citing Murphy v. Florida*). Following our decision in *Bundy*, we conclude that Bertolotti has not shown that he was constitutionally entitled to a change of venue. *See also Cummings v. Dugger*, 862 F.2d 1504, 1511–12 (11th Cir.), *cert. denied*, ⸺ U.S. ⸺, 109 S.Ct. 3169, 104 L.Ed.2d 1031 (1989); *Marsden v. Moore*, 847 F.2d 1536, 1543 (11th Cir.), *cert. denied*, ⸺ U.S. ⸺, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988).

## B. ERROR AT THE GUILT PHASE

### 1. *The Verdict of Guilty (Claim 9)*

 Bertolotti argues that the verdict of guilty may have been based on an impermissible ground and thus must be reversed. This claim is styled both as a claim on the merits, and as a claim asserting ineffective assistance of appellate counsel. *See Evitts v. Lucey*, 469 U.S. 387, 396, 105 S.Ct. 830, 836, 83 L.Ed.2d 821 (1985)

(defendant entitled to effective assistance of counsel on as-of-right appeal). Because appellate counsel failed to raise this claim on Bertolotti's direct appeal, the Florida Supreme Court imposed a procedural bar. *Bertolotti v. Dugger*, 514 So.2d at 1096. The Florida court reached the merits of the ineffectiveness claim, holding that appellate counsel was not incompetent for failing to raise the claim on direct appeal, because trial counsel had failed to preserve the claim at trial; essentially, appellate counsel was not ineffective because trial counsel's error barred the claim. *Id.* at 1097.

This is not the case of a meritorious claim hung in a procedural tangle. Bertolotti argues that insufficient evidence was adduced to convict him of sexual battery and burglary, and that therefore, a verdict of felony murder must be void because it may have been predicated upon either of those two felonies. Bertolotti's basis for this claim is the following statement in the trial court's sentencing order:

> The capital felony was committed while the Defendant was engaged, ... in the commission of a robbery. The Defendant in his voluntary statement admitted that he robbed the victim of approximately thirty dollars at knifepoint. There is strong evidence that the capital crime was committed while the Defendant was also engaged in a burglary and rape, but those factors were not proven beyond every reasonable doubt. Aggravating factor *found* as to robbery only.

(Emphasis in original). The trial judge did not, by this finding, hold that the state produced insufficient evidence to convict Bertolotti of the substantive crimes of burglary or sexual abuse. Rather, the trial judge decided that he would not take the crimes into consideration as aggravating factors justifying imposition of the death penalty. As the judge stated, "strong evidence" did support the state's allegation

---

front-page editorial, regarding the murder and the defendants. Editorials and articles continued to be published in the *News* regularly from May 1973 until the trial in January 1974; in September, the *News* published a letter from the trial judge to the defense attorneys in which the

judge warned defense counsel not to "trifle" with the court. *Id.* at 1496. Emphasizing that the presumed-prejudice standard is only to be invoked under the most extreme of circumstances, we held that the defendant had carried his burden.

that Bertolotti committed burglary and sexual abuse: the state offered testimony that the victim was afraid of strangers and would not likely have invited a stranger into the home; the victim's body was discovered partially nude, and exhibited signs of sexual intercourse. Although a lawyer might argue that the trial judge's use of the term "reasonable doubt" signified that the state had not produced sufficient evidence to convict the defendant, when the term is considered in context it is clear that the judge did not intend to make an insufficiency finding applicable to the guilt phase of the trial. Bertolotti's claim on the merits is quite tenuous; counsel clearly cannot be held ineffective for deciding not to advance the claim on appeal.

### 2. *Unanimity of the Verdict (Claim 9)*

The jury returned a general verdict of guilty upon a charge of premeditated murder and felony murder. Bertolotti argues that even if all the jurors agreed that he was guilty, they may not have agreed on a theory of guilt: thus, six jurors may have thought that Bertolotti was guilty of felony murder but not premeditated murder, and vice versa. The Florida Supreme Court found this claim to be procedurally barred because "trial counsel made no request for a special verdict, nor did he object to the use of the general verdict form." *Bertolotti v. Dugger*, 514 So.2d at 1097. Assuming that this claim arises under the fourteenth amendment, we respect Florida's adequate and independent ground of decision; additionally, because the claim was procedurally barred, appellate counsel cannot be faulted for declining to raise it on direct appeal. *Francois v. Wainwright*, 741 F.2d 1275, 1285 (11th Cir.1984).

### 3. *Evidence of Bertolotti's Propensity to Crime (Claim 10)*

Bertolotti characterizes this as a claim affecting the reliability of his sentencing, but it is clear that evidence of certain prior criminal activity is admissible during the sentencing phase of a capital trial. Fla. Stat. Ann. § 921.141(5)(b); *Zant v. Stephens*, 462 U.S. 862, 886, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983). We will thus consider whether this claim has merit in the context of the guilt phase of Bertolotti's trial. During direct examination, Bertolotti's girlfriend, a prosecution witness, testified as follows:

> I just about had him talked into going [to the police] with me, and he asked me if he could have one more day of freedom because he knew he was going to prison again....

Defense counsel immediately moved for a mistrial, which the judge denied; the prosecutor explained that the statement was inadvertent and that the witness had been warned not to mention Bertolotti's criminal record. The prosecutor indicated that he would not oppose a cautionary instruction; defense counsel objected, arguing that a cautionary instruction would do more harm than good. The trial judge acceded to the defense request. The error was harmless beyond any reasonable doubt in light of the overpowering evidence of guilt adduced in this case; we doubt there is any possibility that the jury would have been less prone to convict Bertolotti had they not suspected him of earlier criminal involvement.

## C. ERROR AT THE PENALTY PHASE

### 1. *The Prosecutor's Penalty–Phase Argument (Claim 2)*

During the sentencing phase of Bertolotti's trial, the prosecutor argued to the jury as follows:

> And he says he didn't rape her.... But the evidence would show otherwise. And here she is found nude from the waist down, her underwear and pants and shoes on the floor of the kitchen. And what does that tell you? The man raped her. And yet he comes in here with the audacity to tell us, "I didn't have sex with her."

The Florida Supreme Court decided that this remark was " 'fairly susceptible' of being interpreted as a comment on the defendant's exercise of his right to remain silent," and as such was improper. *Bertolotti v. State*, 476 So.2d at 132–33. Nevertheless, the Florida court determined that the comment was not "so outrageous as to taint the validity of the jury's recommenda-

tion in light of the evidence of aggravation presented." *Id.,* 476 So.2d at 133. Bertolotti strenuously urges that the decision of the Florida court is a "factual finding" that his fifth-amendment rights were violated, binding on a federal habeas court to the extent stated in 28 U.S.C. § 2254(d). We disagree; the Florida decision is a non-binding opinion on a mixed question of law and fact. *See Cuyler v. Sullivan,* 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714–15, 64 L.Ed.2d 333 (1980). Although the prosecutor's comment may have been improper under Florida law, it was not a violation of Bertolotti's fifth-amendment right to remain silent.

 Our test for determining whether the prosecutor's comments infringed the fifth-amendment right to silence is to ask "whether the statement was manifestly intended or was of such character that a jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Hall v. Wainwright,* 733 F.2d 766, 772–73 (11th Cir.) (*quoting United States v. Vera,* 701 F.2d 1349, 1362 (11th Cir.1983) *and United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.),[18] *cert. denied,* 434 U.S. 902, 98 S.Ct. 295, 54 L.Ed.2d 188 (1977)), *reh. in banc den.,* 749 F.2d 733 (11th Cir.1984), *cert. denied,* 471 U.S. 1107, 105 S.Ct. 2344, 85 L.Ed.2d 858 (1985). The reviewing court must "look to the context in which the statement was made in order to determine the manifest intention which prompted it and its natural and necessary impact upon the jury." *Hall,* 733 F.2d at 773 (*quoting Samuels v. United States,* 398 F.2d 964,

967 (5th Cir.1968), *cert. denied,* 393 U.S. 1021, 89 S.Ct. 630, 21 L.Ed.2d 566 (1969)).

Bertolotti's explanation of the circumstances in which the victim was found was provided to the jury through his taped confessions. Review of the prosecutor's closing argument shows that the attorney's intent was to argue a point in the evidence, not to comment on the fact that Bertolotti declined to take the stand. Nor do we think the jurors would have understood the prosecutor's remarks as a surreptitious comment on Bertolotti's failure to testify; the jury most likely took the comment as an exhortation to conclude from all the evidence admitted that Bertolotti had sexually abused his victim. The comment was within the bounds of reasonable prosecutorial argument, and did not "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974).[19]

2. *Shifting the Burden of Proof (Claim 4)*

 Bertolotti argues that the jury was instructed to presume that a sentence of death was the appropriate penalty in his case unless the defense proved otherwise. *See Jackson v. Dugger,* 837 F.2d 1469, 1474 (11th Cir.), *reh. in banc den.,* 842 F.2d 339 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2005, 100 L.Ed.2d 236 (1988). Review of the jury instructions shows that this was manifestly not the case. The trial judge properly fulfilled his constitutional duty of explaining to the jury the function of miti-

---

18. *See Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (in banc). The Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

19. In district court, Bertolotti argued that he was prejudiced by other of the prosecutor's comments during the penalty phase. The district court rejected the argument, and Bertolotti does not explicitly contest this finding on appeal. Regardless, we agree with the district court's conclusion that the comments, considered cumulatively or individually, did not deny Bertolotti a fair trial. *See also Bertolotti v. State,* 476 So.2d at 133.

Bertolotti characterizes the following prosecutorial statement as impermissible victim-impact evidence (*see infra* Part II.C.6):

And Carol Ward is just kind of an abstract person. Everybody's forgotten about her.

We doubt this statement rises to the level condemned by the Supreme Court in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Nevertheless, considered as another element of Bertolotti's prosecutorial-misconduct claim, we do not consider this statement unconstitutionally prejudicial. *See Davis v. Kemp,* 829 F.2d 1522, 1536 (11th Cir.), *reh. in banc den.,* 835 F.2d 291 (11th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988).

gating and aggravating circumstances. *See Peek v. Kemp,* 784 F.2d 1479, 1494 (11th Cir.) (in banc), *cert. denied,* 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

> The judge instructed the jury as follows: [I]t is your duty to follow the law that will now be given you by the court and render to the court an advisory sentence based upon your determination as to whether sufficient aggravating circumstances exist to justify the imposition of the death penalty and whether sufficient mitigating circumstances exist to outweigh any aggravating circumstances found to exist.

The judge then explained Florida's statutory aggravating circumstances to the jury. Following the explanation, the judge instructed the jurors:

> If you find the aggravating circumstances do not justify the death penalty, then your advisory sentence should be one of life imprisonment without possibility of parole for twenty-five years.

> Should you find sufficient aggravating circumstances do exist, it will then be your duty to determine whether mitigating circumstances exist that outweigh the aggravating circumstances.

The judge next explained the mitigating circumstances, concluding by informing the jury that it could consider in mitigation "[a]ny other aspect of the defendant's character or record and any other circumstance of the offense." The judge further cautioned the jury that any aggravating circumstance must be established beyond a reasonable doubt, but that mitigating circumstances need not be so established. If the jury found an aggravating circumstance, it was to "then consider all of the evidence tending to establish one or more mitigating circumstances and give that evidence such weight as you feel it should receive in reaching your conclusion as to the sentence that should be imposed."

The jury was not instructed that it should presume death to be the appropriate penalty once an aggravating circumstance was established. *Cf. Adamson v. Ricketts,*

865 F.2d 1011, 1041–44 (9th Cir.1988) (in banc) (Arizona capital statute unconstitutional because it required defendant to establish the existence of a mitigating circumstance once an aggravating circumstance had been established, and defendant bore risk of non-persuasion that mitigating circumstances outweighed aggravating circumstances); *Jackson,* 837 F.2d at 1473 (jury instructed that "death is presumed to be the proper sentence" unless aggravating factors are "overridden" by mitigating factors). Rather, Bertolotti's jury was instructed that it must find an aggravating circumstance beyond a reasonable doubt before it need consider mitigating circumstances, and even then it need not look for mitigating circumstances if it found that the "aggravating circumstances do not justify the death penalty." If the jury did find that the aggravating circumstances justified the death penalty, it was to determine whether *any* other aspect of Bertolotti's record or character or offense stood in mitigation of his crime. This set of instructions adequately described the plan of Florida's capital-sentencing statute, *see Proffitt v. Florida,* 428 U.S. 242, 248–51, 96 S.Ct. 2960, 2965–66, 49 L.Ed.2d 913 (1976) (plurality opinion of Stewart, Powell & Stevens, JJ.), quite reasonably focused the jury's attention on the circumstances of the offense and the character of the offender, and adequately bridled the jury's discretion. *Woodson v. North Carolina,* 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) (plurality opinion of Stewart, Powell & Stevens, JJ.).[20]

### 3. *Jury Instruction Concerning Mercy (Claim 3)*

 Bertolotti requested the following jury instruction:

> The Death Penalty is warranted only for the most aggravated and unmitigated of crimes. The law does not require that death be imposed in every conviction in which a particular set of facts occur. Thus, even though the factual circumstances may justify the sentence of death

---

**20.** We need not address the state's argument that the district judge erred by not finding this claim procedurally barred.

by electrocution, this does not prevent you from exercising your reasoned judgment and recommending life imprisonment without eligibility for parole for twenty-five years.

The trial judge denied this instruction, and the Florida Supreme Court affirmed, holding that the instruction was subsumed within the standard jury charge given by the trial judge. *Bertolotti v. State*, 476 So.2d at 132. In *Proffitt v. Wainwright*, we noted that the Constitution did not mandate an instruction explicitly authorizing the jury to disregard the trial evidence and to exercise its power of mercy. 756 F.2d 1500, 1504 n. 5 (11th Cir.), *reh. in banc den.*, 774 F.2d 1179 (11th Cir.1985).[21] What our cases require is that the trial court correctly explain the function of aggravating and mitigating circumstances under state law. *Peek*, 784 F.2d at 1494. As we concluded *supra* Part II.C.2, the trial judge's explanation was adequate in this regard.

### 4. Florida's Construction of the Term "Especially Heinous, Atrocious or Cruel" (Claim 5)

■ Bertolotti argues that the Supreme Court's recent decision in *Maynard v. Cartwright* invalidates the death sentence he received. 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). In *Cartwright*, the Supreme Court vacated an Oklahoma death sentence because the trial judge did not give the sentencing jury an adequately narrow explanation of the term "especially heinous, atrocious or cruel," as that term was used in a statutory aggravating circumstance found by the sentencing jury. Bertolotti reasons that because identical language was used to establish one of the three statutory aggravating circumstances that supported his sentence, and because the trial judge did not give the jury a narrowing construction of the term, his sentencing process was unconstitutionally flawed. We reject this claim.

In *Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir.1989), we recently interpreted *Cartwright* and *Godfrey v. Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), to establish three factors for a federal habeas court to consider in ruling on eighth-amendment vagueness challenges such as the one here asserted:

First, the appellate courts of the state must have narrowed the meaning of the words "heinous, atrocious or cruel" by consistently limiting their application to a relatively narrow class of cases, so that their use "inform[s] [the sentencer of] what [it] must find to impose the death penalty." *Cartwright*, 108 S.Ct. at 1858. Second, the sentencing court must have made either an explicit finding that the crime was "especially heinous, atrocious or cruel" or an explicit finding that the crime exhibited the narrowing characteristics set forth in the state-court decisions interpreting those words. Third, the sentencer's conclusion—that the facts of the case under consideration place the crime within the class of cases defined by the state court's narrowing construction of the term "heinous, atrocious or cruel"—must not have subverted the narrowing function of those words by obscuring the boundaries of the class of cases to which they apply.

875 F.2d at 1514.

A plurality of the United States Supreme Court decided in 1976 that Florida courts had adequately limited the class of capital murders to which this aggravating circumstance can be applied consistently with the requirements of the eighth amendment. Florida's appellate construction, holding the term to mean "the conscienceless or pitiless crime which is unnecessarily torturous to the victim," provides sufficient guidance "to those charged with the duty of recommending or imposing sentences in capital cases." *Proffitt*, 428 U.S. at 255–56, 96 S.Ct. at 2968 (plurality opinion of Stewart, Powell & Stevens, JJ.). *Cf. Lind-*

---

**21.** The Tenth Circuit has held that the trial judge may not specifically instruct the jurors *not* to consider "sympathy, sentiment, passion, prejudice or other arbitrary factor" during capital sentencing. *Parks v. Brown*, 860 F.2d 1545, 1552 (10th Cir.1988) (in banc), *cert. granted sub nom. Saffle v. Parks*, —— U.S. ——, 109 S.Ct. 1930, 104 L.Ed.2d 402 (1989). Bertolotti's jury received no such instruction.

*sey,* 875 F.2d at 1514 (identical construction).

Second, the trial judge, who under the Florida death-penalty statute is the sentencer, Fla.Stat.Ann. § 921.141(3), explicitly found the facts to warrant the aggravating circumstance. Thus, the sentencing judge specifically concluded that:

> The capital felony was especially heinous, atrocious, or cruel. After hearing the Defendant's own account of this murder and considering the physical evidence it is difficult for the mind to imagine the horror and pain that Carol Ward must have suffered during the defendant's clumsy and protracted efforts to kill her. There is no question that she was stripped or forced to disrobe, threatened, bludgeoned, strangled and repeatedly stabbed. Her wounds clearly demonstrate that she tried to defend herself. A knife was actually broken from its handle in the first series of stabbings. Because she was "still moving" the defendant left the area and then returned with a second knife to continue the stabbing.

*See Palmes v. Wainwright,* 725 F.2d 1511, 1523–24 & n. 12 (11th Cir.), *reh. in banc den.,* 729 F.2d 1468 (11th Cir.), *cert. denied,* 469 U.S. 873, 105 S.Ct. 227, 83 L.Ed.2d 156 (1984). We have no reason to doubt that the sentencing judge, "who is presumed to know and apply the appropriate, narrow construction" of the aggravating circumstance, was guided by the Florida appellate construction of the words "especially heinous, atrocious or cruel." *Lindsey,* 875 F.2d at 1514 n. 5. Nor do the circumstances recounted by the sentencing judge give any indication that Bertolotti was sentenced to death as a result of the sentencer's belief that any intentional murder is especially heinous, atrocious or cruel. *Cf. Cartwright,* 108 S.Ct. at 1859; *Godfrey,* 446 U.S. at 428–29, 100 S.Ct. at 1765.

Finally, by finding that these facts exemplified "heinous, atrocious or cruel" behavior, the sentencer did not subvert the eighth-amendment channelling function of that term as narrowed by the Florida supreme court. Even though not required by the eighth amendment, the aggravating circumstance here was applied to a case presenting "torture or serious physical abuse," *Cartwright,* 108 S.Ct. at 1859; we therefore can see a "principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not." *Godfrey,* 446 U.S. at 433, 100 S.Ct. at 1767.

### 5. *"Automatic" Aggravating Circumstance (Claim 6)*

■ Bertolotti was convicted of felony murder; later, following the penalty phase of his trial, the sentencer found in aggravation of Bertolotti's crime the circumstance that he murdered while in the course of a robbery. Bertolotti argues that his conviction during the guilt phase thus insured a sentence of death during the penalty phase, and as such the death penalty was unconstitutional.

The Supreme Court recently rejected a nearly identical claim. *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* the petitioner had been convicted of a death-eligible murder under a statute that required the jury to find that "the offender has a specific intent to kill or to inflict great bodily harm upon more than one person." 484 U.S. at ——, 108 S.Ct. at 554. The only aggravating circumstance found by the jury to justify the death penalty was that "the offender knowingly created a risk of death or great bodily harm to more than one person"; the statute and the aggravating circumstance were "interpreted in a 'parallel fashion'" under state law. *Id.* Rejecting the petitioner's assignment of error, the Supreme Court noted that "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase." *Id.*

■ The *Lowenfield* reasoning applies to the instant case: Florida may narrow the class of death-eligible defendants at either the guilt phase or the penalty phase of capital trials. Moreover, consistent with the judge's instructions, *see supra* Part II.C.2, the jury could have found Ber-

tolotti guilty of felony murder and yet still not have concluded that the parallel aggravating circumstance justified the imposition of capital punishment; nor need the sentencing judge have agreed with the jury's determination that felony murder had been proven beyond a reasonable doubt. *Cf. supra* Part II.B.1 (judge did not agree with jury's finding that burglary and sexual battery had been proven beyond a reasonable doubt). In no sense did the jury's verdict of felony murder automatically predestine the judge's imposition of Florida's highest penalty. *See Adams,* 709 F.2d at 1447.[22]

### 6. *"Victim Impact" Evidence (Claim 7)*

During the sentencing phase of the trial, the prosecutor engaged the victim's husband in the following colloquy:

A: If I was home, my wife would open a door, although she would prefer I do so. Throughout our marriage she often was upset if I opened the door to strangers, mentioning the danger there might be. I did not feel that danger, but my wife did.

Q: All right, sir. Now, was she particularly concerned with black strangers?

Defense: Your Honor, I'm going to object to leading the witness and suggesting the answer.

Court: Sustained. Reframe your question.

Q: Did she have any particular concerns about who the strangers were that would come to the door?

A: All strangers upset my wife if they were young and male.

Bertolotti argues that this colloquy introduced impermissible victim-impact evidence into the trial. *See South Carolina v. Gathers,* —— U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989); *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). This evidence was not introduced for the purpose of establishing the personal worth of the victim, decrying the emotional impact of the murder upon the Ward family, or describing the family's perception of the crime. *Cf. Gathers,* 109 S.Ct. at 2210; *Booth,* 482 U.S. at 498, 107 S.Ct. at 2531. Rather, the prosecutor introduced the evidence to rebut Bertolotti's defense to burglary—that he had been invited into the Ward home. This evidence "relate[d] directly to the circumstances of the crime," and was "relevant to rebut an argument offered by the defendant." *Booth,* 482 U.S. at 507 n. 10, 107 S.Ct. at 2535 n. 10; *cf. Gathers,* 109 S.Ct. at 2211 (text of papers carried by victim not relevant to circumstances of the crime because there was no likelihood that petitioner had read the text or murdered the victim because of the text). Moreover, and as the district court concluded, this colloquy is of a markedly different scope and tone from the evidence condemned by the *Booth* Court. As the evidence was relevant to prove a fact in issue, *cf.* Fed.R.Evid. 401 & 402, and not overly prejudicial or inflammatory, *cf.* Fed.R.Evid. 403, we cannot say that this information was "constitutionally impermissible or totally irrelevant to the sentencing process." *Cf. Booth,* 482 U.S. at 502, 107 S.Ct. at 2533 (*quoting Zant v. Stephens,* 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983)).

### III. CONCLUSION

We are satisfied that the petitioner's conviction and sentence of death were obtained by the State of Florida consistently with the requirements of the United States Constitution. Accordingly, we AFFIRM the district court's decision denying Anthony Bertolotti the writ of habeas corpus.

CLARK, Circuit Judge, concurring in part and dissenting in part.

I concur in all of the majority's opinion except for its determination in part II.A.1. of Bertolotti's ineffective assistance of counsel claim. I dissent because the dis-

---

**22.** To the extent that Bertolotti challenges the use of felony murder as an aggravating circumstance, he attacks a decision firmly within the discretion of the Florida legislature. *Gregg v. Georgia,* 428 U.S. 153, 176, 96 S.Ct. 2909, 2926, 49 L.Ed.2d 859 (1976) (plurality opinion of Stewart, Powell & Stevens, JJ.) (determinations of appropriate sentencing considerations are "peculiarly questions of legislative policy"). The Florida statute was adjudged constitutional in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion of Stewart, Powell & Stevens, JJ.).

trict court erred by not requiring that the writ issue unless the state provides Bertolotti a resentencing hearing so that evidence with respect to his mental condition can be considered as mitigating evidence. Because defense counsel failed to have Bertolotti undergo a court-ordered mental evaluation, the jury was prevented from considering two Florida statutory mitigating circumstances as well as non-statutory mitigating circumstances. Furthermore, defense counsel did not have sufficient information with which to properly prepare for the sentencing proceeding, interviewing family members, investigating Bertolotti's mental health history, and preparing for argument. *Cf. Magill v. Dugger*, 824 F.2d 879 (11th Cir.1987).

There is no question but that counsels' inadvertent failure to schedule the mental evaluation of the petitioner in this case constitutes deficient performance. Furthermore, the record reveals that this failure precluded the defendant from receiving the individualized sentencing proceeding that has been mandated by *Lockett/Eddings/Skipper/Hitchcock* and *Penry*. While the majority finds no prejudice in this case, it "voluntarily" goes out of its way to discuss counsels' performance and to conclude that this performance was reasonable. Besides being contrary to the dictates of *Strickland v. Washington*, 466 U.S. 668, 697, 104 S.Ct. 2052, 2069, 80 L.Ed.2d 674 (1984), which states that a court should dispose of a claim of ineffective assistance of counsel on the prejudice inquiry if that is easier, this overreaching by the majority also creates law that conflicts with other cases of this circuit. *See, e.g., Blake v. Kemp*, 758 F.2d 523, (11th Cir.), *cert. denied*, 474 U.S. 998, 106 S.Ct. 374, 88 L.Ed.2d 367 (1985); *Magill*, 824 F.2d 879; *Stephens v. Kemp*, 846 F.2d, 642 (11th Cir.), *cert. denied*, — U.S. —, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

Bertolotti appeals the denial of his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Bertolotti alleges that his trial counsel rendered him ineffective

assistance by not having Bertolotti examined by a psychiatrist in order to both develop a possible insanity defense and to develop mitigating evidence for use in the sentencing hearing in the event a guilty verdict was returned. In this case, after interviewing the petitioner and conducting some preliminary investigation, the attorneys for Bertolotti requested a psychiatric evaluation. The court granted this request and, about six months before trial, Dr. Pollack was appointed to evaluate Bertolotti. Counsel for Bertolotti, however, delayed making the arrangements necessary for the psychiatric exam until the morning of the sentencing hearing at which time Bertolotti refused to see the doctor. At the State rule 3.850 hearing, Bertolotti's lawyers testified that in hindsight they should have had Bertolotti examined prior to trial and certainly would do so if they were currently handling the defense. *See Bertolotti v. State*, 534 So.2d 386, 388 (Fla.1988).

## INEFFECTIVE ASSISTANCE

As the majority recognizes, we evaluate claims of ineffective assistance of counsel under the test enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prevail in this case, Bertolotti must show that his lawyers' performance fell outside the scope of reasonably professional assistance and that there is a reasonable probability that the results of either the guilt or penalty phase proceedings would have been different but for the alleged substandard performance. *Id.* at 104 S.Ct. 2052.

### A. *Deficient Performance.*

Under the facts of this case, the failure to investigate Bertolotti's mental condition through a psychiatric exam was clearly unreasonable. The district court's conclusion (also reached by trial court) that "nothing in Petitioner's history or in his behavior surrounding the murder and his subsequent confessions was so unusual as to call his mental condition into question," (D.Ct.Op. at 31) is, as the Florida Supreme Court found,[1] wholly refuted by the record:

---

1. Petitioner contends that this finding of the Florida Supreme Court deserves a "presumption of correctness" under 28 U.S.C. § 2254(d). The

presumption does apply to both appellate and trial court findings. *See Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).

First, the fact that a psychiatric evaluation was both requested and granted and the fact that a psychiatrist was obtained to conduct an evaluation right before the sentencing hearing belies a conclusion that counsel had no reason to suspect mental illness. Second, each of the three attorneys who were involved with the case at the preparation stage admitted at the 3.850 hearing that the petitioner should have been examined.

Mr. DuRocher, who was the elected Public Defender of the Ninth Judicial Circuit, initially interviewed the petitioner and assigned the case to Assistant Public Defenders, Mr. Wolf and Mr. Kenny. Mr. DuRocher's qualifications are impeccable. He received his law degree from the University of Florida and was admitted to practice law in the State of Florida in 1967. After approximately two years in private practice, Mr. DuRocher became director of the Legal Aid Society of Orange County and served in that position until 1971 when he was elected to the bench to preside in juvenile court. Some five years later, Mr. DuRocher resigned to reenter private practice, a practice with an emphasis on criminal matters. Finally, in 1980, Mr. DuRocher ran for and was elected to the position of Public Defender, and he had been in that position for three years when he first interviewed Mr. Bertolotti.

When asked whether, as a result of his interview, he had formed an opinion as to whether Mr. Bertolotti should be mentally evaluated, Mr. DuRocher stated, "[Y]es, all the signals were there. You had to—he should have been evaluated." Mr. DuRocher questioned Bertolotti's mental condition based on several factors, one being the nature of Bertolotti's story of what happened. "... I told him that if [his story were] true, then we must seriously investigate the mental condition, possible mental illness of the woman, Mrs. Ward. Because if what he was telling me was true, then

she was crazy or vice versa." He later elaborated "—and [his story] was a clue to me because either she [had mental problems] or he did." R. 3.850 H. at 274–306.

Mr. Kenny, one of the assistant attorneys on the case, agreed that, in this situation, a psychiatric evaluation was necessary. He testified as to numerous things that occurred during the preparation of the case that caused him to be concerned about Bertolotti's mental state and summarized:

> Along with everything else it was one of those things that just seemed to indicate that [Bertolotti] wasn't all there, to use a colloquial term; he may have had a mental problem. I'm not saying that all these things are definitive, that [sic] show absolutely that he had a mental problem but they are the kinds of things I think ought to be explored by somebody who knows more about it than I do or [Mr. Wolf] did.

R. 3.850 H., Vol. 21 at 145. Additionally, as the Florida Supreme Court noted:

> [N]otes taken by Mr. Wolf reflect that Sharon Griest, Bertolotti's girlfriend at the time of the murder, told him that she "believes" that Bertolotti "needs psychiatric help," that "he did not know what he was doing at the time of the offense" and that he might have a "split personality." Griest also told Mr. Wolf that Bertolotti was discussing "suicide a great deal." Even Mr. Wolf acknowledged that these statements in conjunction with other factors should have caused him to question Bertolotti's mental condition.

534 So.2d at 389.

The above testimony is only a smattering of the evidence that reveals that the attorneys assigned to Bertolotti's case had every reason to question their client's sanity. Furthermore, this evidence clearly reveals that the failure of counsel to secure a mental health exam was not the result of any trial tactic or strategy. Rather, attorney

Claims of ineffective assistance of counsel, however, are generally thought to embody "mixed questions" of law and fact not subject to the § 2254(d) presumption. *Strickland,* 466 U.S. at 698, 104 S.Ct. at 2070. The Florida Supreme Court concluded that "defense counsel *had reason* to question defendant's sanity." *Bertolotti,* 534 So.2d at 388 (emphasis added). I think that

it is a close question whether this determination is a question of law or of fact. The Florida Supreme Court, however, seemed to make this determination in the context of applying the legal standard it set for deciding whether counsels' conduct was in violation of *Strickland*'s performance prong. I, therefore, do not accord the finding the § 2254(d) presumption.

Kenny testified by deposition that it was the result of inadvertence and scheduling problems:

Q: So you have no idea why Mr. Wolfe didn't have a mental health expert in regard to defending the felony murder charge? ...

A: No, I can't [sic]. He may have told me and I can't remember. At this date, I can't remember. I think, and this is just speculation, it was one of those things that he didn't think was real correct or just for some reason, never got around to doing until it was too late.

\* \* \* \* \* \*

Q. Apparently, effort [to obtain a mental health evaluation] was made before? ...

A: What it came down to in the end was a scheduling problem with [the psychiatrist] and, in hindsight, I think that we, A, should have gotten somebody else, although, quite honestly, we didn't want to have somebody else....

R. 3.850 H. at 897–98; 941.

Upon reaching the conclusion that counsel failed to obtain available psychiatric evidence for no strategic reason, our inquiry into counsels' performance should end with a finding that counsel performed deficiently. The majority in this case, however, credits counsels' inadvertence as a "decision not to secure a psychiatric examination until the morning of Bertolotti's sentencing hearing." Maj. op. at pages 1511–12. It then proceeds to discuss the reasonableness of this "decision." Characterizing counsels' accidental failure to secure a mental exam until the morning of the sentencing hearing as a "decision" that must be evaluated for "reasonableness" oversteps the settled law of this Circuit regarding this issue.

It is true that any decision not to investigate must be reasonable. *Armstrong v. Dugger*, 833 F.2d 1430, 1433 (11th Cir.

1987). A failure to investigate that is not the result of any trial strategy, however, is no decision at all. *Harris v. Dugger*, 874 F.2d 756, 762 (11th Cir.1989). Thus, in *Middleton v. Dugger*, 849 F.2d 491, 494 (11th Cir.1988), we held that counsel's failure to make any effort to investigate the petitioner's background was unreasonable because it was not based on any discernible trial strategy. Likewise, in the present case, counsel performed deficiently when for no reason, they failed to schedule an available mental health examination as part of an investigation into Bertolotti's mental condition.

Although the majority's depiction of counsels' fortuitous actions as an actual "decision" sets up a dangerous precedent for future cases, the actual analysis the majority employs to find that this "decision" was reasonable is even more disheartening. In an attempt to dismiss the evidence as insufficient to alert the attorneys to the possibility of Bertolotti's insanity, the majority dissects the evidence and discusses the insufficiency of each "alleged signal" of mental instability. This seriatim analysis wholly fails to address the bigger picture. The cumulative effect of all of the evidence undeniably points to the necessity of ordering a mental health evaluation. DuRocher and Bertolotti's trial attorneys all testified that, on the whole, Bertolotti's case required the assistance of a psychiatrist. As the majority opinion itself demonstrates, ample signs of Bertolotti's mental impairment existed.

The majority further rejects as too specific the Florida Supreme Court's holding that "where there is evidence calling into question a defendant's sanity, defense counsel is bound to seek the assistance of a mental health expert." Rather than embrace what it terms a state rule,[2] the ma-

2. The majority characterizes the Florida Supreme Court's finding that counsel for Bertolotti was deficient as an opinion based upon a "state-law standard." Maj. op. at p. 1510. The majority bases this conclusion, not upon the opinion of the Florida Supreme Court, but upon a provision of the Florida Constitution giving the court the power to discipline attorneys. *Id.* at p. 1510. The Florida Supreme Court's opinion, however, is totally devoid of reference to state law. Specifically, the majority takes issue with the Flor-

ida Supreme Court's requirement that counsel seek the assistance of a mental health expert whenever there is evidence that calls the defendant's sanity into question. Maj. op. at p. 1510; *see Bertolotti*, 534 So.2d at 388. Although the Florida Supreme Court cites *Bush v. Wainwright*, 505 So.2d 409 (Fla.), *cert. denied*, 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987) for this proposition, an examination of *Bush* shows that the court in that opinion was apply-

jority prefers to evaluate counsels' behavior under a "reasonableness" standard. Maj. op. at p. 1510. Although I disagree with the majority that *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985) and its progeny does not require that counsel seek the assistance of a mental health expert whenever the defendant's sanity is likely to be a significant factor at trial, I find that under any measure of reasonableness, trial counsel performed inadequately in this case.

The majority recognizes that *Ake* requires the state to provide access to a psychiatrist if an indigent defendant "makes *a preliminary showing* that his sanity at the time of the offense is likely to be a significant factor at trial." After stating this observation, however, the majority goes on to say that *Ake* requires the state to provide a mental health expert only when the defendant "exhibits *compelling* evidence of incompetency or insanity." Thus, reasons the majority, while *Ake* does imply that counsel would be deficient if he or she did not conduct a reasonable investigation into the possibility of raising an insanity defense where evidence of the defendant's potential insanity is *compelling,* *Ake* does not imply that counsel must actually seek the assistance of a mental health expert where such evidence is less than "compelling." Maj. op. at p. 1511.

Such a distinction is not in the *Ake* decision. *Ake* does not require "compelling evidence" of incompetency or insanity before a State must provide a mental health examination. Rather, the defendant need only make "a preliminary showing" that his sanity will be a significant issue at trial in order to invoke his constitutional right to a psychiatric exam. *Ake*, 105 S.Ct. at 1092. The right to psychiatric assistance also exists at the sentencing phase where psychi-

atric aid could serve as rebuttal to the State's presentation of aggravating circumstances. *Ake*, 105 S.Ct. at 1097. If the defendant has a constitutional right to this exam, it follows that counsel does not act reasonably in foregoing this constitutional right without any investigation or strategy in mind. *Cf. Elledge v. Dugger*, 823 F.2d 1439, 1444–45 (11th Cir.), *opinion withdrawn in part*, 833 F.2d 250 (11th Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988) (counsel performed inadequately when, although he believed petitioner was "crazy," he failed to seek expert psychiatric witness and to interrogate petitioner's relatives).

Moreover, in *Blake*, 758 F.2d at 531, we noted that a critical link exists between minimally effective assistance of counsel and the need for psychiatric aid. *See also Magill*, 824 F.2d at 889–90 (counsel performed inadequately when he failed to secure testimony of available psychiatrist who would have testified favorably and instead called medical witness who testified unfavorably as to statutory mitigating circumstances). Thus, although we do evaluate counsel's actions to determine whether they are "reasonable," no counsel could justify a decision to forego a mental evaluation as part of an overall investigation into the defendant's mental health where, as here, sufficient indications of mental incompetency exist. Finally, the trial court in this case had already granted the request for a psychiatric evaluation. Thus, a "preliminary showing" had already been made. Under these circumstances, the proper inquiry is whether the failure to capitalize on the *existing opportunity* to have a mental evaluation was reasonable, not whether one should have been ordered in the first instance. With no strategy to justify the failure to obtain this potentially

ing the Supreme Court's opinion in *Ake v. Oklahoma*. *See Bush*, 505 So.2d at 410.

I point this error out not because it effects the outcome of this case. As the majority correctly notes, we are not bound by state determinations that particular conduct is or is not effective assistance of counsel. Maj. op. at p. 1510. I point out the majority's characterizations of the Florida opinions because the characterizations ignore important federalism concerns. The Su-

preme Court rejected the majority's approach in *Michigan v. Long*, 463 U.S. 1032, 1040–41, 103 S.Ct. 3469, 3476–77, 77 L.Ed.2d 1201 (1983), when it held that unless the state court clearly expresses that its decision rests on independent and adequate state grounds, federal courts are to presume that "the state court decided the case the way it did because it believed federal law required it to do so." The majority's characterization ignores this teaching.

crucial evidence, the answer must be a resounding "no."

While the majority holds that counsels' failure to secure a mental health expert was a reasonable decision in regard to the guilt phase of Bertolotti's trial, it concedes that "evidence of mental impairment could still have been used during the penalty phase of the trial." Maj. op. at p. 1515. As the majority correctly points out, even if counsel believed Bertolotti was sane at the time he committed the crime, enough evidence of mental impairment existed so as to alert counsel to the possibility of presenting evidence of this impairment in mitigation of punishment. *See Stephens*, 846 F.2d at 653 (for purposes of guilt phase, trial counsel entitled to rely on psychiatric report stating that petitioner was sane when he committed crime, but counsel had enough indications of petitioner's mental instability to require that he investigate the possibility of presenting evidence of this instability in mitigation of punishment at the penalty phase of trial).

Nonetheless, the majority concludes that counsel was not deficient for failing to present any evidence of Bertolotti's mental health in mitigation of punishment. The majority bases its conclusion on nothing more than the fact that counsel secured a mental health expert to evaluate Bertolotti on the morning of his sentencing hearing. Thus, the majority concludes, if anyone was unreasonable it was Bertolotti because he refused to see this expert at that time. This conclusion totally begs the question of whether *counsels'* actions were reasonable; that is, whether it was reasonable for them to procrastinate until immediately before the sentencing proceeding before scheduling Bertolotti's psychiatric evaluation. Under the circumstances of this case, Bertolotti's refusal was quite understandable; the decision as to his fate was only hours away. In addition, attorney Kenny testified that it is quite common for an indigent defendant to initially refuse to undergo such an exam. Bertolotti's initial refusal to be seen by a psychiatrist on the morning of his hearing does not exonerate counsel from their totally inadequate representation in neglecting to secure an exam until the last possible moment.

In sum, the majority wholly fails to acknowledge that counsel unintentionally neglected to have Bertolotti evaluated by a psychiatrist. Furthermore, it ignores the cases of this Circuit which emphasize the importance of psychiatric evidence in capital punishment cases. *See Blake*, 758 F.2d at 531; *Magill*, 824 F.2d at 889–90; *Stephens*, 846 F.2d at 653–55. The results of a mental evaluation in this case would have allowed counsel to fully consider the possibility of an insanity defense as well as provide counsel with possible mitigating evidence to be used during the penalty phase. Clearly the failure to obtain such an evaluation constituted deficient performance.

### B. *Prejudice.*

Agreeing as I do with the Florida Supreme Court that counsel for Bertolotti was ineffective in failing to have their client examined by a psychiatrist, I must also analyze whether that failure prejudiced Bertolotti's defense in the sentencing phase of his trial. The majority holds that it does not; I must respectfully disagree. At the Rule 3.850 hearing, Bertolotti presented the testimony of Dr. James R. Merikangas, who testified that he had been a medical doctor for 18 years and is Board certified in neurology and psychiatry. He is an Assistant Clinical Professor of Psychiatry at Yale University School of Medicine. He has evaluated approximately 185 violent criminals and was qualified as an expert witness by the trial court. In addition to concluding that Bertolotti was insane at the time of committing the crime, Merikangas also found that the murder was committed while Bertolotti was under the influence of extreme mental or emotional disturbance, that he acted under extreme duress, and that his capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of law were substantially impaired.

The absence of this evidence deprived Bertolotti of an individualized sentencing hearing. The failure to obtain a mental health expert deprived the jury of an opportunity to consider two statutory mitigating circumstances—whether at the time of the crime Bertolotti was under the influence of

extreme mental or emotional disturbance and whether Bertolotti's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. Just as importantly, this testimony could have served as nonstatutory mitigating evidence. *Cf. Middleton*, 849 F.2d at 495 (psychiatric evidence has potential to change whole evidentiary picture).

This court has recognized that "psychiatric evidence has the potential to totally change the evidentiary picture by altering the causal relationship that can exist between mental illness and homicidal behavior. Thus, psychiatric mitigating evidence not only can act in mitigation, it also could significantly weaken the aggravating factors.'" *Middleton*, 849 F.2d at 495 (citation omitted). In the present case, the jury recommended death by a vote of nine to three. In addition, the trial court found three aggravating circumstances: (1) that Bertolotti had previously been convicted of three violent felonies; (2) that the murder occurred during the commission of a robbery and; (3) that the murder was especially heinous, atrocious and cruel. The trial court found no mitigating circumstances. Merikangas' testimony, however, had "the potential to alter the entire evidentiary picture." For example, the jury could have found that Bertolotti's mental problems accounted for the heinous nature of the crime. The evidence could also have given the jury a context in which to understand Bertolotti's prior violent behavior. Finally, Merikangas' testimony could have given the jury two statutory mitigating circumstances to consider against the aggravating circumstances. That this could have altered the result in this case is beyond argument. The Florida Supreme Court in Bertolotti's case stated:

> As recognized by the United States Supreme Court, where a defendant's mental condition is in question, "without the assistance of a mental health expert ... the risk of an inaccurate resolution of sanity issues is extremely high." 105 S.Ct. at 1096. The trial court's conclusion that defense counsel "had no reason to doubt Bertolotti's sanity in any respect" is not supported by the testimony

and other evidence adduced at the 3.850 hearing. Considering only these factors which the public defender's office was aware of prior to trial, it is apparent that defense counsel had reason to question Bertolotti's sanity at the time of the offense.

534 So.2d 386, 388. Given the fact that the jury voted 9 to 3 for the death penalty in the absence of two statutory mitigating circumstances and the accompanying nonstatutory mitigating circumstances, no one is smart enough to know how the jury would have voted with respect to the penalty in this case. The nine jurors were adversely influenced by the prosecutor's improper argument in the penalty phase of the case. The Florida Supreme Court found in its first review of this case that the "prosecutor clearly overstepped the bounds of proper argument on at least three occasions.... These considerations are outside the scope of the jury's deliberation and their injection violates the prosecutor's duty to seek justice, not merely 'win' a death recommendation." 476 So.2d at 132–33.

Despite the strong precedent of this court to the contrary, the majority holds that there was no prejudice in the sentencing phase of this case in part because it finds Dr. Merikangas' report internally inconsistent and contradicted by the State's own experts. The majority concludes that a jury would likely have found the State's experts more credible. Although I strongly contest the majority's characterization of Merikangas' testimony, I am more disturbed by the fact that, in reaching its conclusion, the majority has impermissibly invaded the province of the jury.

First, the majority's characterization of Merikangas' testimony as inconsistent or weak is without foundation. After presenting testimony regarding documents concerning Bertolotti's history, Dr. Merikangas testified concerning his interview with the petitioner. He testified that Bertolotti suffers from schizophrenia of the chronic undifferentiated type. Testifying that Bertolotti was a typical patient suffering from schizophrenia, he found that as a young man he never dated women because

he was too socially crippled, that he was on the fringe of society and that his functioning had deteriorated.

Two pieces of documentary evidence that were relied upon by Merikangas in reaching his conclusions are of note. First, Bertolotti was incarcerated in the State of Georgia in 1973 and was reviewed for parole on November 19, 1973. Parole Supervisor David A. Kasriel noted that "subject's psychological report shows a likelihood of 'crazy,' irrational behavior. I believe a more thorough psychological evaluation is needed before I could make a parole recommendation." R. 3.850 H. at D. Ex. J. The referenced psychological report, if ever prepared, is not in the record. Second, Bertolotti was in prison in the State of Florida in 1982 and Walter H. Cary, Jr., Clinical Psychologist at the Baker Correctional Institution, summarized his conclusions in a document dated March 5, 1982:

> Testing and interview indicate that this subject has a sociopathic personality. He has made a great improvement over previous testing. Previously, there were indications of the possibility of disorganization under stress, cyclic bizarre and/or aggressive behavior and sexual dysfunction. All of these indications have now disappeared, and it is likely that this subject will do well in a work release setting. However, it should be noted that persons with profiles similar to the subject's present one, have extremely high recidivism rates, usually for crimes of a property offense nature.

R. 3.850 H. at D. Ex. K. In addition to this information, Merikangas testified that Bertolotti's mother was a schizophrenic and that the disease has a genetic component making it relevant in reaching a diagnosis.

Concluding that Bertolotti was insane at the time of the offense and did not know what he was doing and did not know it was wrong at the time of the offense, he stated:

> I believe my opinion is that he is a schizophrenic who had a catastrophic reaction to stress, that people with this disorder are predisposed to break down under conditions of stress and to go berserk, as this man apparently did; and that this is borne out not only by his recounting of the crime and the several

different versions which he used, but by the facts that are documented in the autopsy and the police report of a berserk rage, stabbing multiple times with two different knives, for instance; his actions after the crime of leaving bloodstains all around and leaving the weapon there and going home and hiding these clothes; his girl friend, who is not a trained psychologist, observing that there was something weird and strange about him; his blubbering and whining and decompensating while giving a voluntary confession to the police the first time, and then coming back with another different confession that tried to implicate his girl friend after he had time to consider it and calm down; and his past history all point to the same conclusion.

R. 3.850 H. at 431. Dr. Merikangas further testified that schizophrenics do not always act strange or appear unusual, but have periods of remission and exacerbation. Finally, Dr. Merikangas opined that in committing the crime, Bertolotti was under the influence of extreme emotional distress, that he acted under emotional duress and that his ability to conform his conduct to the requirements of law was substantially impaired.

This evidence demonstrates that Merikangas relied on Bertolotti's medical and prison records, other documents in Bertolotti's file, and his personal interviews of both Bertolotti and Bertolotti's family members. Contrary to the findings of the majority, I find that Merikangas' observation of Bertolotti's "inappropriate emotional behavior" was corroborated. The confession tapes depict Bertolotti in an extremely emotional state. At the rule 3.850 hearing, trial counsel stated that Bertolotti should have been examined by a psychiatrist "[g]iven the nature of the crime, given some of the stuff that Bertolotti did both before and after the crime, *some of his behavior*, I would think that [an exam] would be more than just one of those things to protect your behind." (Emphasis added). Finally, Bertolotti's girl friend observed that Bertolotti was acting strangely after the crime and believed that he needed "psychiatric help." There is no basis for

concluding that Merikangas' testimony was so unreliable or inconsistent as to dismiss it as irrelevant information for the jury to consider.

Second, the majority improperly evaluates the credibility of Merikangas vis-a-vis that of the State's experts. The State presented the testimony of Dr. James D. Upson who did not personally examine Bertolotti but reached a conclusion based on a review of documents in the file. A summary of his testimony is reflected by the following:

Q. Doctor, did you review the report and deposition of a Doctor James Merikangas?

A. I did.

Q. And as a result of reviewing his deposition, his report and findings, and based upon your review of the records of Mr. Bertolotti, the witness statements, and did you listen to the taped confession of Mr. Bertolotti?

A. I did.

Q. Were you able to render some professional opinion as to whether or not you agreed with his findings and the basis for his findings in this case of, one, schizophrenia and, two, temporary insanity?

A. I don't disagree with the basis of his findings because essentially he used the same basis I did with the main exception, he interviewed Mr. Bertolotti. But as near as I could tell, he used a fairly standard psychiatric approach which relies quite heavily on interview data and history.

I do disagree with the conclusions of his report, his conclusion was that Mr. Bertolotti is schizophrenic; exhibiting periods of delusions.

Again, I make these statements having never dealt with the gentleman. But from the record, I would come up with a little different diagnosis.

My feeling is that his characteristics, as documented in the records, more clearly reflect anti-social behavior and depression. I don't see or have the same interpretation of events that the psychiatrist did as I don't see the signs of delusions in his history.

Again, they may well be there through an interview or through testing.

R. 3.850 H. at 523–24. At another point in his testimony, Dr. Upson stated that he would feel more comfortable with his conclusion if he had had an opportunity to examine Bertolotti.

The State's chief witness at the rule 3.850 hearing was Dr. Robert Kirkland, a Board certified psychiatrist who had a number of years of experience and had testified in court an estimated 100 times.

Dr. Kirkland interviewed Bertolotti at the jail, took a family history, asked him about the facts surrounding the crime, and observed his conduct. After stating various findings, he then concluded: "So in summary, what I saw was a young man in a very difficult situation who shows no evidence of having any major psychotic mental disorder or mental disorder of brain damage origin. Either yesterday, nor at any significant time in the past." R. 3.850 H. at 566. When asked whether he had reviewed an opinion by Dr. James Merikangas, he described it as "hogwash." When asked whether he had an opinion concerning Bertolotti's sanity and insanity, at the time of the crime, Dr. Kirkland stated: "I believe that at that time, Mr. Bertolotti was legally sane and responsible for his actions." *Id.* at 570.

The other witness for the State with respect to Bertolotti's mental condition was John L. Cassady, a Staff Psychologist at the Orange County Jail, who had a Masters Degree in Psychology. Bertolotti had been placed on a suicide watch and Cassady observed him from time to time but did not notice anything unusual or bizarre about him at the time Cassady was present. The trial court did not allow Cassady to testify on the subject on whether Bertolotti was sane or insane, but did allow him to testify that from his observations he saw nothing which would lead him to believe that Bertolotti had ever suffered from schizophrenia.

From the evidence presented at the hearing, one cannot conclude that the State's experts are objectively any more believable than Dr. Merikangas. All of the State's

experts relied on the same sources of information as Dr. Merikangas although, unlike Merikangas, each only looked at a part of the evidence available. Although the State's expert testimony is subject to the same "well-considered attack on several fronts" that the majority undertakes with respect to Dr. Merikangas' testimony, such attacks are inappropriate on appellate review. Our function is not to weigh the respective witnesses' testimony.

I also disagree with the majority's conclusion that there was no prejudice because, even if the mitigating evidence had been presented, a jury would have found that the aggravating circumstances outweighed any mitigating evidence. This evaluation is the kind of second-guessing that can deprive a defendant of an individualized sentencing determination, *see Knight v. Dugger*, 863 F.2d 705 (11th Cir. 1988), and should only be undertaken when there is absolutely no doubt as to what the outcome would be. Because the effect of psychiatric evidence in the sentencing phase is so uncertain, such an evaluation cannot be made by an appellate court in this case.

The question of prejudice is a highly factual one. Some cases from our Circuit are instructive. For example, in *Armstrong v. Dugger*, we held that:

> The major requirement of the penalty phase of a trial is that the sentence be individualized by focusing on the particularized characteristics of the individual. *See Eddings v. Oklahoma*, 455 U.S. 104, 112, 102 S.Ct. 869, 875, 71 L.Ed.2d 1 (1982); *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976). The evidence before the district court plainly established that Armstrong's trial counsel failed to provide the jury with the information needed to properly focus on the particularized characteristics of this petitioner.

833 F.2d at 1433. In addition, we held in *Blake*, 758 F.2d at 534–35, that although damaging evidence "very well could have persuaded a jury to impose the death sentence in any event, Blake was nonetheless prejudiced in the absence of character evidence.... 'Certainly [it] would have provided some counterweight to the evidence of bad character which was in fact received.'" (Citation omitted). More recently, we held that the failure to present character evidence at the sentencing phase of trial, after counsel undertook no investigation, prejudiced the defense because "the jury did not assess 'the information needed to properly focus on the particularized characteristics of this petitioner.'" *Harris*, 874 F.2d at 763 (citation omitted).

In *Stephens*, 846 F.2d at 646, this Circuit found prejudice where trial counsel conducted no investigation into the possibility of introducing evidence of the defendant's mental history and mental capacity in the sentencing phase of defendant's trial. The only testimony that the jury heard as to the defendant's occasional bizarre behavior was that which was presented as an afterthought by the defendant's mother in answer to a question by the trial judge. In addition, defense counsel made no comment on this testimony in closing argument. This court held that "the resulting prejudice is clear.... In light of the way that [the facts of mental impairment] came in, ... arguing their importance as mitigating circumstances may well have been futile. As a result, however, although the jury heard some testimony concerning the [defendant]'s mental condition, the jurors were left with no guidance concerning how they might take such facts into consideration in mitigation of punishment." *Id.* at 655.

Next, in *Magill*, 824 F.2d 879, we found that errors made during the sentencing phase of the petitioner's trial, combined with errors made during the guilt phase, resulted in ineffective assistance of counsel in violation of the sixth amendment. In *Magill*, counsel failed to present available mitigating evidence in the form of psychiatric testimony. The psychiatrist in question had treated Magill and would have testified that the petitioner exhibited signs of serious emotional problems at the age of thirteen and could have been expected to commit a crime of serious magnitude. Because this psychiatrist would have been much more helpful than the one who actually testified, and because ample evidence existed in mitigation of a death sentence, we

found that the errors committed at trial sufficiently prejudiced the petitioner so as to entitle him to a new sentencing proceeding.

In yet another case, *Middleton*, 849 F.2d 491, we found that trial counsel's almost total lack of background investigation despite conversations with the petitioner that such evidence existed, constituted deficient performance. Turning to the question of prejudice, we found that prejudice occurred because of the considerable amount of factual and record evidence which could have been used in mitigation of punishment. Further, we recognized that psychiatric testimony was available and this evidence could well have met the standard for statutory mitigating circumstances.

The present case is analogous to these cases. Like the *Middleton* case, Dr. Merikangas could have testified as to the existence of three statutory mitigating circumstances: extreme emotional disturbance, diminished capacity and duress. In *Ake v. Oklahoma*, the Court emphasized the importance of live psychiatric testimony as a meaningful way of presentation of mitigating evidence.

> Psychiatrists can translate a medical diagnosis into language that will assist the trier of fact, and therefore offer evidence in a form that has meaning for the task at hand. Through this process of investigation, interpretation, and testimony, psychiatrists ideally assist lay jurors, who generally have no training in psychiatric matters, to make a sensible and educated determination about the mental condition of the defendant at the time of the offense.

470 U.S. at 80–81, 105 S.Ct. at 1095. Additionally, as in *Magill*, Dr. Merikangas could have aided the defense in the preparation and presentation of nonstatutory mitigating circumstances. *See id.* at 83, 105 S.Ct. at 1096 ("assist in evaluation, preparation, and presentation of the defense"). Based on the facts of this case and the cases discussed above, I conclude that Bertolotti was indeed prejudiced at the sentencing phase of his trial.

*Thompson v. Wainwright*, 787 F.2d 1447 (11th Cir.1986), a case cited by the majority as support for its conclusion, is easily distinguished. In *Thompson*, the petitioner did not offer any psychiatric evidence that could have been presented at the sentencing phase. Thus, the court held that the omission of evidence merely consisting of the petitioner's poor school records and medical reports suggesting a personality disorder was not prejudicial. In this case, psychiatric evidence was available. Because of the importance of psychiatric evidence, the jury, and not this court, should be the one to weigh this evidence in determining the appropriate sentence for Bertolotti.

*Daugherty v. Dugger*, 839 F.2d 1426, 1431 (11th Cir.1988), is similarly distinguishable. In *Daugherty*, the petitioner argued that counsel's failure to offer psychiatric evidence of his domination by his girl friend prejudiced him in the sentencing phase of his trial. *Id.* at 1431. Unlike Bertolotti's attorneys, Daugherty's attorney did present other evidence in mitigation similar to the evidence that would have been produced by the expert testimony. *Id.* at 1432. Second, the nature of the evidence Daugherty sought to introduce is markedly different than Bertolotti's. Daugherty's attorney consulted a psychiatrist and a psychologist and concluded that their testimony would not be adequate to support the domination theory. *Id.* at 1431. In addition, the attorney did not present the evidence because he feared that the weak evidence he did have available would be worse than no expert evidence at all. *Id.* He also feared that presentation of the expert evidence would prompt the state to present Daugherty's previous testimony that directly contradicted his domination claim. *Id.* In Daugherty's case the evidence that was alleged as prejudicial was at best cumulative and was probably counterproductive. Thus, rather than weighing competing evidence to determine if Daugherty was prejudiced, the court was faced with a case where the defendant could not show that any *additional evidence* existed at the time of trial that would provide any *credible support* for his domination claim. Bertolotti, on the other hand, has proven that he would have had credible favorable testimony that sup-

ported a mitigating factor not presented to the jury because of counsel's failure.

The majority also relies on *Bundy v. Dugger,* 850 F.2d 1402 (11th Cir.1988). Bundy, unlike Bertolotti, refused to allow any evidence of a mental disorder to be introduced. *Id.* at 1412. Bundy's decision made any evidence of mental disorder irrelevant to the case. If the Defendant would not have allowed the evidence to be presented, counsel's failure to present it could not have prejudiced Bundy. Thus, *Bundy* can be seen as a case where no usable evidence existed rather than one where the court weighed conflicting testimony. As the majority points out, Bertolotti did refuse to allow an examination immediately before his sentencing hearing. Bundy's attorney, however, investigated the defense, and Bundy's refusal to allow the evidence to be presented was based upon that investigation. *Id.* Bundy's informed decision distinguishes his refusal from Bertolotti's.

In addition, the majority relies on *Elledge v. Dugger,* 823 F.2d at 1447–48. Although a superficial reading of *Elledge* lends some support to the majority's position, I find the present case sufficiently distinguishable. First, unlike, the defendant in *Elledge,* Bertolotti has shown that the contested mitigating evidence was reasonably available to counsel. The record reveals that Bertolotti's father believed that Bertolotti was strange and peculiar almost from birth. The defendant's girl friend, Sharon Griest, had told Mr. Wolf that Bertolotti might have a "split personality." The availability of this information along with Merikangas' testimony of what a psychiatric evaluation could have yielded, demonstrates that a failure to pursue these avenues resulted in prejudice to the petitioner.

Next, unlike *Elledge,* the overlooked evidence was nothing but favorable to the petitioner. In *Elledge,* some of the uncovered witness testimony would have been favorable but other testimony from those same witnesses would have been unfavorable.

Most importantly, unlike the *Elledge* case, the defense psychiatrist's testimony was credible. Merikangas based his findings on his own interview and neurological evaluation of the petitioner. In addition, his testimony is corroborated by several earlier evaluations that are part of the record. *See* R. 3.850 H. at D. Exs. J & K. Furthermore, in *Elledge* the several state experts that served to rebut the defense's expert all personally examined ·Elledge over the years. In this case, only one of the State's experts actually examined Bertolotti personally. Thus, this is not a case where the expert testimony was clearly weighted to one side. Rather it really came down to one expert versus the other. Moreover, although the State put on its own experts to refute Merikangas' evaluation, the only qualified expert, Kirkland, testified only as to Bertolotti's sanity, not to his mental condition as it might relate to the penalty phase of the trial. Merikangas testified favorably to the defense in regard to both of these issues.

When one critically looks at our cases in this area, it is evident that we have distinguished between the cases where credible and useful psychiatric evidence was available and ones where it was not. When it has been available, we have refrained from invading the province of the jury by weighing evidence and determine issues of credibility. *See, e.g., Stephens,* 846 F.2d at 655 (jurors left with no guidance as to how they might consider facts of mental instability in mitigation); *Armstrong,* 833 F.2d at 1434 (availability of expert who would have testified that petitioner was mentally retarded and suffered from organic brain damage enough to meet prejudice requirement). As the majority admits, "because psychiatry and psychology are 'arts, not sciences,' reasonable professionals could differ in their diagnosis." Maj. op. at p. 1518. The majority's reasoning discards this distinction.

## CONCLUSION

The underlying issue in this case is whether Bertolotti's sentencing hearing met constitutional standards. *Penry v. Lynaugh,* —— U.S. ——, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) is the latest Supreme

Court decision to discuss the evolving *Furman* principle which teaches that sentencing in death penalty cases is governed by the particularized circumstances of the crime and the defendant. The Court in *Penry* stated:

> In order to ensure "reliability in the determination that death is the appropriate punishment in a specific case," *Woodson* [*v. North Carolina*], 428 U.S. [280], at 305, 96 S.Ct. [2978], at 2991 [49 L.Ed.2d 944 (1976)], the jury must be able to consider and give effect to any mitigating evidence relevant to a defendant's background, character, or the circumstances of the crime.... Our reasoning in *Lockett* and *Eddings* thus compels a remand for resentencing so that we do not "risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty." *Lockett* [*v. State of Ohio*], 438 U.S. [586], at 605, 98 S.Ct. [2954], at 2965 [57 L.Ed.2d 973 (1978)]; *Eddings* [*v. Oklahoma*], 455 U.S. [104], at 119, 102 S.Ct. [869], at 879 [71 L.Ed.2d 1 (1982)] (concurring opinion). "When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Lockett*, 438 U.S., at 605, 98 S.Ct., at 2965.

109 S.Ct. at 2951–52.

I recognize that *Lockett* and its progeny, including *Penry*, govern a line of cases where state action prevented jury consideration of mitigating evidence. In Bertolotti's case it was the ineffectiveness of counsel that prevented such consideration. Nevertheless, in appraising whether prejudice occurred it is essential that we consider the consequence of an attorney's ineffectiveness which denies a defendant an individualized sentencing. It is literally the difference between life and death. No person can determine with hindsight whether this nine to three jury decision would have been the same if the jury had heard the psychiatric evidence. One can with some reason hypothecate that the three jurors thought Bertolotti was mentally deranged from the very facts of the killing itself. The proper judicial decision in this case is to remand the case for a new sentencing hearing as was done in *Lockett, Eddings, Skipper, Hitchcock,* and *Penry*.